# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MAINE

| | |
|---|---|
| _____ ) | Chapter 11 |
| In re: ) | |
| ) | Case No. 19-10034 |
| PENOBSCOT VALLEY HOSPITAL, ) | |
| ) | |
| ) | |
| Debtor. ) | |
| _____) | |
| ) | |
| PENOBSCOT VALLEY HOSPITAL, ) | |
| ) | |
| Plaintiff, ) | Adversary Proceeding No. 20-1005 |
| ) | |
| v. ) | |
| ) | |
| JOVITA CARRANZA, in her capacity as ) | |
| Administrator for the U.S. Small Business ) | |
| Administration, ) | |
| ) | |
| Defendants. ) | |
| _____) | |

## OPPOSITION TO MOTION
## FOR TEMPORARY RESTRAINING ORDER

The United States of America (the "United States"), on behalf of the Small Business

Administration (SBA) and Jovita Carranza, solely in her capacity as Administrator of the SBA,

files this opposition to plaintiff's Motion for a Temporary Restraining Order (Dkt 2).

## INTRODUCTION

Plaintiff's motion for a temporary restraining order along with its complaint seeks entry

of a preliminary and permanent injunction raising broad challenges to the SBA's implementation

and administration of the CARES Act Payroll Protection program (PPP), a $659 billion loan

guarantee program that must extend hundreds of thousands of loans to small businesses and non-

1

profits across the nation in a matter of days. Specifically, Plaintiff asks the Court to overturn the

SBA's stated, explicit policy of excluding bankrupt entities from the PPP.  Granting the

injunctive relief Plaintiff seeks risks disrupting the administration of the PPP, in the middle of

loan distribution. Such a drastic result would only be justified by a strong showing that Plaintiff's

claims are likely to succeed on the merits, that Plaintiff will be irreparably harmed absent relief

and that the requested injunction is in the public interest. Plaintiff cannot demonstrate any of

those requirements.

Plaintiff cannot demonstrate that it is likely to succeed on its claims, because its claims

are facially invalid.

First, the injunctive relief plaintiff seeks against the SBA is barred by sovereign

immunity under controlling case law in this circuit. Second, Plaintiff's anti-discrimination claim

under 11 U.S.C. 525 fails because, by its plain terms, Section 525 does not apply to loans or loan

guarantees. Third, plaintiff cannot obtain a preliminary injunction through its Administrative

Procedure Act (APA) claims or through its writ of mandamus because those claims are not core,

and thus the bankruptcy court lacks jurisdiction to order relief on those claims. Plaintiff's APA

and mandamus claims otherwise fail on their merits because the SBA acted wholly within its

delegated authority in implementing the PPP.  The bankruptcy exclusion was addressed in two

separate agency rules. And Congress, through the CARES Act and Small Business Act,

explicitly delegated authority to the Administrator to issue those rules.

Plaintiff also fails to proffer all but the barest conclusory assertions to support its claim

for irreparable harm, which is far from sufficient to support its claim for injunctive relief.

Further, awarding an injunction here would be against the public interest. In implementing the

PPP, the SBA made a policy decision to limit PPP loans to those who had not filed for

bankruptcy; in essence indicating a preference for what is a limited source of funding. Plaintiff

asks the Court to replace the SBA's stated policy with the Plaintiff's policy preference. Doing so

would eviscerate Congress' choice to vest with the SBA the authority to implement the PPP and

oversee its own lending program.

## BACKGROUND

**The Small Business Administration**

Through the Small Business Act, 15 U.S.C. § 631 *et seq.*, Congress created the SBA to

"aid, counsel, assist, and protect, insofar as is possible, the interests of small-business concerns,"

in order to preserve the system of free competitive enterprise that is "essential" to the economic

well-being and security of the Nation. 15 U.S.C. § 631(a).  To promote that objective, Congress

placed the SBA under the management of a single Administrator, *id.*, § 633(a), (b)(1), who is

given "extraordinarily broad powers" under section 7(a) of the Act, 15 U.S.C. § 636(a), to

provide a wide variety of technical, managerial, and financial assistance to small-business

concerns.  *See SBA v. McClellan*, 364 U.S. 446, 447 (1960); *see generally* 15 U.S.C. § 636(a)

(describing numerous varieties of general small-business loans the Administrator is "authorized"

and "empowered" to make); 13 C.F.R. § 120.1.  In the performance of these authorized

functions, the Administrator is further empowered to "make such rules and regulations as [she]

deems necessary to carry out the authority vested in [her]," and in addition to "take any and all

actions … [that] [she] determines … are necessary or desirable in making … loans." 15 U.S.C. §

634(b)(6), (7).

**Section 7(a) Lending**

The section 7(a) loan program is the SBA's primary program for providing financial

assistance to small businesses. Under the terms of the Small Business Act, SBA financial

3

assistance to a small business under section 7(a) may take the form of a direct loan, an immediate

participation (joint) loan with a lender, or a deferred participation (guaranteed) loan initiated by a

lender but a portion of which the SBA will purchase from the lender in the event of a borrower

default.  13 C.F.R. § 120.2(a); *see Valley Nat'l Bank v. Abdnor*, 918 F.2d 128, 129 (10th Cir.

1990); *California Pac. Bank v. SBA*, 557 F.2d 218, 219 (9th Cir. 1977).  In practice, however, the

SBA ordinarily guarantees loans made by private lenders rather than disbursing funds directly to

borrowers, *see United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 719 (1979), thus "reduc[ing]

risk for lenders … mak[ing] it easier for them to access capital," and thereby "mak[ing] it easier

for small business to get loans."  *See* https://www.sba.gov/funding-programs/loans.

**Section 7(a) Loan Underwriting**

Ordinarily, to qualify for an SBA general business loan an applicant must be an operating

business organized for profit that is located in the United States, 13 C.F.R. § 120.100(a)-(c);

meet the size standards for a "small" business set forth under the statute and SBA rules (usually

stated in terms of number of employees, or average annual receipts), *see* 15 U.S.C. § 632(a)(2);

13 C.F.R. § 120.100(d); 13 C.F.R. Part 121; and demonstrate that the desired credit is not

available elsewhere on reasonable terms, 15 U.S.C. § 632(h); 13 C.F.R. §§ 120.100(e), 120.101.

In addition to these requirements, the Small Business Act requires that "[a]ll loans made

under this subsection *shall* be of such sound value or so secured as reasonably to assure

repayment."  15 U.S.C. 636(a)(6) (emphasis added).  For regular 7(a) loans, the factors to

reasonably assure repayment are described in general terms in 13 C.F.R. § 120.150.  Further

factors are described in greater detail in Standard Operating Procedures (SOP) and on the official

application form for 7(a) loans.  *See* SOP 10-50-05(K); SBA Form 1919.

4

Official form 1919 considers whether the applicant has "ever filed for bankruptcy protection." *Id.* By regulation, requirements listed on this form, and other official SBA forms, comprise part of the "Loan program requirements." 13 CFR Sec. 120.10. Lenders in turn agree to abide by these Loan program requirements when joining the section 7(a) lending program. 13 C.F.R. Sec. 120.10; *see also* SBA Forms 3506 and 3507 (addressing new PPP lenders).

**The Coronavirus Aid, Relief, and Economic Stimulus (CARES) Act**

On March 27, 2020, President Trump signed into law the Coronavirus Aid, Relief, and Economic Stimulus ("CARES") Act, Pub. L. 116-136, 134 Stat. 281, passed by Congress to provide an unprecedented package of emergency economic assistance and other support to help individuals, families, businesses, and health-care providers cope with the enormous economic and public health crises—unlike any experienced in the lifetime of the Nation—triggered by the worldwide coronavirus (COVID-19) pandemic. *See* SBA, Interim Final Rule, "Business Loan Program Temporary Changes; Paycheck Protection Program" (the "First Interim Final Rule"), Fed. Reg. Vol. 85 No. 73 at 20811.

Among the numerous measures taken by the CARES Act to address the COVID-19 crisis, of concern here is the Paycheck Protection Program ("PPP"), CARES Act. § 1102, enacted to extend relief to small businesses experiencing economic hardship as a result of the public-health measures being taken to minimize the public's exposure to the COVID-19 virus. *See* First Interim Final Rule. Specifically, section 1102(a)(2) of the CARES Act adds a new paragraph (36) to section 7(a) of the Small Business Act, 15 U.S.C. § 636(a)(36) to extend loans to eligible small businesses for certain covered uses, including "payroll costs," the "payment of interest on any mortgage obligation," and "rent," among other approved uses. CARES Act 1102(a)(2); 15 U.S.C. § 636(a)(36)(F)(i).

Otherwise, the existing section 7(a) requirements and limitations remain unaltered and govern PPP lending. The CARES Act provides that "*[e]xcept as otherwise provided in this paragraph*, the [SBA] *may* guarantee [PPP] covered loans"—not make loans directly, however—"under the same terms, conditions, and processes as a loan made under this subsection," i.e., section 7(a). 15 U.S.C. § 636(a)(36)(B) (emphasis added).

The PPP then sets forth in extensive detail the precise ways in which PPP covered loans differ from other section 7(a) loans. *Id*. § 636(a)(36)(D)-(R).  Among these differences, the PPP authorizes the SBA to make covered loans to various non-profit organizations, independent contractors, and self-employed individuals, as well as to small business concerns, *id*. § 636(a)(36)(D)(i), (ii); relaxes size limitations to allow businesses with as many as 500 employees (or more, depending on the industry in which they operate) to receive assistance, *id*. § 636(a)(36)(D)(i)(I); and (iii) selectively waives certain of the SBA's affiliation rules used to make small business "size."

The CARES Act leaves unaltered the requirement that "[a]ll loans made under this subsection *shall* be of such sound value or so secured as reasonably to assure repayment." 15 U.S.C. § 636(a)(6) (emphasis added).

The CARES Act initially allocated $349 billion to guarantee PPP loans.  Shortly after the PPP program first opened, the SBA issued a notice stating that the PPP was closed to new applications. Congress then passed the Paycheck Protection Program and Health Care Enhancement Act (CARES Act 2) on April 24 to add an additional $310 billion to the PPP. PL 116-139 § 101(a)(1).The SBA posted notice on its website that it would begin accepting new PPP applications from participating lenders on Monday, April 27, 2020 at 10:30 am. *See*

"Notice: PPP Resumes April 27, 2020," available at https://www.sba.gov/funding-programs/loans/coronavirus-relief-options/paycheck-protection-program#section-header-0.

**Emergency Rulemaking Authority**

The CARES Act authorizes the Administrator of the SBA to issue emergency regulations to implement the PPP without complying with typical notice and comment requirements. CARES Act § 1114.  The Administrator of the SBA posted its First Interim Final Rule on the SBA website on April 3, 2020.  The First Interim Final Rule was subsequently published in the Federal Register on April 15.  The First Interim Final Rule "streamlin[es] the requirements of the regular 7(a) loan program." *Id*. at 20812. For instance, the rule states that lenders need not comply with case by case underwriting requirements of 13 CFR 120.150. *Id.* at 20812.  Instead, under a section titled "What Do Lenders Have to Do in Terms of Loan Underwriting," the rule states that "Each lender's underwriting obligation under the PPP is limited to [the enumerated] items above and reviewing the 'Paycheck Protection Application Form.'" The Paycheck Protection Application Form itself requires the borrower to certify, among other things, that it is "not presently involved in a bankruptcy."  SBA Form 2483.

On April 24, concurrent with Congress' extension of additional funding for the PPP, SBA posted a new interim final rule, which was subsequently published in the Federal Register on April 28, 2020. "Business Loan Program Temporary Changes; Paycheck Protection Program – Requirements – Promissory Notes, Authorizations, Affiliation, and Eligibility" (the "Fourth Interim Final Rule[1]). The Fourth Interim Final Rule provides additional information regarding a

---

[1] The SBA also issued a second interim final rule addressing affiliation rules, 85 FR 20817, and a third interim final rule addressing additional eligibility criteria and certain pledges of loans.  85 FR 21747.

number of eligibility requirements. Section III(4) of the Fourth Interim Final Rule specifically

addresses entities in bankruptcy. It provides:

> *4. Eligibility of Businesses Presently Involved in Bankruptcy Proceeding.*

> *Will I be approved for a PPP loan if my business is in bankruptcy?*

> No.  If the applicant or the owner of the applicant is the debtor in a bankruptcy proceeding, either at the time it submits the application or at any time before the loan is disbursed, the applicant is ineligible to receive a PPP loan.  If the applicant or the owner of the applicant becomes the debtor in a bankruptcy proceeding after submitting a PPP application but before the loan is disbursed, it is the applicant's obligation to notify the lender and request cancellation of the application.  Failure by the applicant to do so will be regarded as a use of PPP funds for unauthorized purposes.

> The Administrator, in consultation with the Secretary, determined that providing PPP loans to debtors in bankruptcy would present an unacceptably high risk of an unauthorized use of funds or non-repayment of unforgiven loans.  In addition, the Bankruptcy Code does not require any person to make a loan or a financial accommodation to a debtor in bankruptcy.  The Borrower Application Form for PPP loans (SBA Form 2483), which reflects this restriction in the form of a borrower certification, is a loan program requirement.  Lenders may rely on an applicant's representation concerning the applicant's or an owner of the applicant's involvement in a bankruptcy proceeding.

## ARGUMENT

## I.    LEGAL STANDARD

A preliminary injunction is an "extraordinary and drastic remedy" that is "never awarded

as of right," *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citation omitted), and "may only be

awarded upon a clear showing that the plaintiff is entitled to such relief," *Winter v. Nat. Res. Def.*

*Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction must show that

(1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence

of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the

public interest. *Id.* at 20. The last two factors "merge when the Government is the opposing party."

*Nken v. Holder*, 556 U.S. 418, 435 (2009).

"Because a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1256 (10th Cir.2003); *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir.2007) ("In general, a preliminary injunction ... is the exception rather than the rule.").

Injunctions that disrupt the status quo are disfavored and "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1259 (10th Cir. 2005). An injunction disrupts the status quo when it changes the "last peaceable uncontested status existing between the parties before the dispute developed." *Id.* at 1260. In such instances, the district court may not  grant a preliminary injunction unless the plaintiff "make[s] a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms." *Langlois v. Abington Housing Auth.*, 207 F.3d 43 (1st Cir. 1999); *Auburn News Co., Inc. v. Providence Journal Co.*, 659 F.2d 273, 277 (1st Cir.1981) and *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 976 (10th Cir.2004) (en banc). This heightened standard accords with the historic purpose of the preliminary injunction, which is to "preserve the relative positions of the parties until a trial on the merits can be held." *See O Centro*, 389 F.3d at 977. "Of these four factors, the probability-of-success component in the past has been regarded by us as critical in determining the propriety of injunctive relief. " *See, e.g.*, *Planned Parenthood League v. Bellotti*, 641 F.2d 1006, 1009-22 (1st Cir.1981); *Lancor v. Lebanon Housing Authority,* 760 F.2d 361 (1st Cir. 1984).

Here, the status quo is that the Plaintiff is excluded from the PPP program because it is in active bankruptcy. And this is not a recent filing, this ch. 11 case was filed on January 29, 2019 and there is no confirmed plan. The Plaintiff has not received any PPP loan and the money

Plaintiff seeks is available to guarantee loans for eligible applicants. Because Plaintiff seeks to

disrupt this status quo, it bears a heightened standard of "mak[ing] a strong showing both with

regard to the likelihood of success on the merits and with regard to the balance of harms." *O*

*Centro*, 389 F.3d at 976.

    For the reasons that follow, Plaintiff has not carried these heavy burdens.

## II.    PLAINTIFF FAILS TO ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS.

### A.    The Small Business Act's Jurisdiction-Stripping Provision Precludes The Injunctive Relief Plaintiff Seeks.

    While the Small Business Act does contain a waiver of sovereign immunity, that waiver

is limited.  It provides that the SBA may:

> sue and be sued in any court of record of a State having general jurisdiction, or in
> any United States district court, and jurisdiction is conferred upon such district
> court to determine such controversies without regard to the amount in controversy;
> *but no attachment, injunction, garnishment, or other similar process, mesne or
> final, shall be issued against the [agency] or [its] property[.]*

15 U.S.C. § 634(b)(1) (emphasis added).

    This statute precludes jurisdiction in suits seeking injunctive or any similar relief against

the SBA. *See United States v. Mel's Lockers, Inc.*, 346 F.2d 168, 170, (10th Cir. 1965) ("The

provisions in the Small Business Act which permit the Administrator to  be sued, specifically

provide that no injunction shall be issued against the Administrator or his property. This

language is too clear for misunderstanding that there is no waiver by Congress as to injunction

suits.") (waiver of sovereign immunity in Bankruptcy Act did not override prohibition on

injunctions); *see also Mar v. Kleppe*, 520 F.2d 867, 869 (10th Cir. 1975) ("The decisions have

uniformly considered that this statute effectively precludes injunctive relief against the

Administrator.") (collecting cases).  Other circuit courts have reached the same conclusion. *See*

*J.C. Driskill, Inc. v. Abdnor*, 901 F.2d 383, 386 (4th Cir. 1990) (explaining that "courts have no

jurisdiction to award injunctive relief against the SBA"); *Enplanar, Inc. v. Marsh*, 11 F.3d 1284,

1290 (5th Cir.1994) (same).  Because Congress has removed authority to enjoin the SBA,

Plaintiff's request for preliminary injunction must be denied.

> **B.      Plaintiff's Anti-Discrimination Claim Will Fail Because Section 525 of the Bankruptcy Code Does Not Apply to Loans.**

Section 525(a) of the Bankruptcy Code prohibits a governmental unit from denying,

revoking, suspending, or refusing to renew "a license, permit, charter, franchise, or other similar

grant . . ." on the basis of being or having been a debtor in bankruptcy. By its plain language, the

prohibition in 525(a) does not apply to lending or loan guarantees.

Indeed, the only mention of lending in Section 525 is found in subsection (c), added in

1994 to address government student loan programs. 103 P.L. 394 § 313. Subsection (c) provides:

"[a] governmental unit that operates a student grant or loan program . . .  may not deny a grant,

loan, loan guarantee, or loan insurance to a person that is or has been a debtor under this title or .

. . under the Bankruptcy Act . . . "  28 U.S.C. § 525(c).  If Section 525 applied to government

guaranteed loans more broadly, Congress would not have needed to amend the law to include

government student loan programs. And in amending the law to address government student

lending, Congress could have addressed other government lending programs, but chose not to.

Each Circuit that has addressed this issue has determined that a government entity

conditioning a loan on whether the party receiving the loan is in bankruptcy *does not* violate

section 525 because a loan is not "grant" that is similar to a "license, permit, charter, [or]

franchise."  *See*, *e.g.*, *Watts v. Pennsylvania Housing Fin. Co.*, 876 F.2d 1090, 1094 (3d Cir.

1989) (holding that an emergency home loan assistance program in which payments were

suspended if an entity filed for bankruptcy and the automatic stay was not lifted did not violate

section 525); *Ayes v. U.S. Department of Veterans Affairs*, 473 F.3d 104, 110 (4th Cir. 2006)

(holding that veteran loan guarantee was not within the scope of section 525); *Toth v. Michigan State Housing Development Authority*, 136 F.3d 477, 480 (6th Cir. 1998) (holding that section 525 does not apply to state issued home improvement loans). The Second Circuit reached the same conclusion in a case concerning student loans prior to the amendment of section 525 in 1994 to include 525(c). *In re Goldrich*, 771 F.2d 28, 30 (2d Cir.1985) (interpreting omission of post-discharge credit arrangements from language of § 525 as intentional and declining to extend § 525 to student loan guarantees).

A number of district and bankruptcy courts have reached the same conclusion. *See, e.g.*, *In re Jasper*, 325 B.R. 50, 55 (Bankr. D. Me. 2005) (revoking credit union privileges on the basis of filing for bankruptcy did not violate section 525); *United States v. Cleasby*, 139 B.R. 897, 900 (Bankr. W.D. Wis. 1992) (holding a loan is not a "similar grant" within the meaning of § 525 and declining to extend § 525 protection to applications for debt restructuring); *Lee v. Yuetter*, 106 B.R. 588, 592 (Bankr. D. Minn.1989) (declining to extend § 525 protection to applications for debt restructuring program and analogizing program to extensions of credit), *aff'd*, 917 F.2d 1104 (8th Cir.1990).

For instance, a bankruptcy court in the District of Utah extensively reviewed the statutory history of 11 U.S.C. and existing case law. *In re Rees*, 61 B.R. 114, 116-24 (Bankr. D. Utah 1986). The Bankruptcy court explained that 11 U.S.C. § 525 "intended to codify the rule of *Perez v. Campbell*, 402 U.S. 637 (1971), which held that a state could not frustrate the Congressional policy of a fresh start for a bankrupt by refusing to renew a driver's license based on a discharged judgment resulting from an automobile accident." *In re Rees*, 61 B.R. at 116-17. An early proposal for the provision contained broad language prohibiting "discriminatory treatment because he, or any person with whom he is or has been associated, is or has been a

debtor or has failed to pay a debt discharged in a case under the Act. *Id*. "The credit industry was extremely concerned about the wording . . . , and urged that it be redrafted to limit its application to *Perez*-type situations and prevent its application in the field of credit granting." *Id*. at 118.The provision was subsequently redrafted to hue more closely to the *Perez* decision, prohibiting discrimination in the issuance of "a license, permit, charter, franchise, or other similar grant." *Id.*

     The PPP is in no way like the archetypal driver's license in *Perez*, nor the other items enumerated in Section 525(a). The PPP does not provide a right to engage in a specific activity or profession, like a license, permit, charter or franchise." 11 U.S.C. § 525(a); see *Ayes*, 473 F.3d at 109 (the enumerated items in 525(a) "implicate 'government's role as a gatekeeper in determining who may pursue certain livelihoods' . . . and show that Congress intended § 525(a)'s protections to be limited to situations sufficiently similar to *Perez*") (quoting *Toth*, 136 F.3d at 480). The PPP operates to provide emergency funding to certain eligible small businesses. Business that are excluded from funding are not prohibited from operating, as with a refusal to provide a license, permit, charter or franchise. And, unlike the archetypal driver's license, where the state is the sole entity to provide licensing, the PPP is not the sole source of funding. Indeed, entities in active bankruptcy may be eligible for other relief under the CARES Act itself, including Emergency EIDL grants. *See* CARES Act § 1110.[2]

---

[2] The PPP is indisputably a lending and loan guarantee program. *See e.g.*, CARES Act § 1102(a)(2) (addressing "covered loans"), § 1102(b) (appropriated funding available "for commitments for general business loans authorized under section 7(a) of the Small Business Act, including loans made under paragraph (36) of such section [PPP loans]." Plaintiff concedes as much. *See, e.g.*, Compl. ¶ 61 ("PPP offer applicants guaranteed loans that are not otherwise obtainable in the private marketplace."). It has been argued, however, that PPP loan guarantees are so generous as to be effectively grants. But whether PPP extends loan guarantees or grants is not relevant. The proper question is whether the PPP is "similar to a license, permit, charter, franchise." 11. U.S.C. § 525(a). As described above, the PPP is not similar to those enumerated items.

### C.    Plaintiff's APA Claims Will Fail.

1.    The Bankruptcy Court Lacks Jurisdiction to Award Injunctive Relief on Plaintiff's APA Claim and its Mandamus Claim Because Those Claims Are Not "Core."

This Court has described the bankruptcy court's jurisdiction over core and non-core proceedings.  'Core' proceedings are matters 'arising under' and 'arising in' cases under title 11. Matters 'arise under' title 11 if they involve a cause of action created or determined by a statutory provision of title 11. Matters 'arise in' a bankruptcy if they concern the administration of the bankruptcy case and have no existence outside of the bankruptcy.

'Non-core' proceedings are those that do not depend on the bankruptcy laws for their existence and that could proceed in another court even in the absence of bankruptcy.

\*       \*       \*

"[B]ankruptcy judges do not enter final orders or judgments in non-core proceedings. Rather, they submit proposed findings of fact and conclusions of law to the district court, which enters final orders and judgments after de novo review.

*Arellano v. Montoya (In re Arellano)*, 2007 WL 1746246, \*4, No. 07-ap-1024 (Bankr D. N.M. June 14, 2007) (Starzynski, J.) (citing *Wood v. Wood (In re Wood)*, 825 F.2d 90, 92 (5th Cir.1987) and *Personette v. Kennedy (In re Midgard Corporation)*, 204 B.R. 764, 771 (10th Cir. B.A.P.1997)); *accord ADT Sec. Servs., Inc. v. Firstline Sec., Inc.*, 2008 WL 5226376, \*3, No. 08-cv-00466 (D. Colo. Dec. 12, 2008).

Plaintiff's APA and mandamus claims do not arise out of title 11.  As such, the bankruptcy court lacks jurisdiction to award any injunctive relief on these claims based on APA claims. *Aimtree Co. v. AT & T Corp. (In re Aimtree Co.)*, 202 B.R. 154, 156 (D. Kan. 1996) (noting "bankruptcy court lacked statutory authority to enter an injunction in this 'non-core' proceeding").

2.      The Bankruptcy Exclusion is Authorized by Explicit Rules and Congress
Delegated the Administrator Broad Discretion to Issue Those Rules.

Plaintiff is also unlikely to succeed on its claim that the Defendant exceeded statutory

authority because the claim lacks any merit. Plaintiff argues that the bankruptcy exclusion must

be unlawful because it is not specifically mentioned in the CARES Act. But the fact that the

CARES Act is silent on bankruptcy ineligibility[3] is far from dispositive. The Court instead

"reviews the interpretation of statutes the [Administrator] is entrusted to administer under the

principles articulated in *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837 (1984)." *Comanche Nation

of Okla. v. Zinke*, 754 Fed. Appx. 768, 772-73 (10th Cir 2018). "Unless Congress has directly

spoken to the precise question at issue, we ask only whether the agency's answer is based on a

permissible construction of the statute." *Id.* at 773 (internal quotations marks omitted). The

agencies interpretation then receives "controlling weight unless it is arbitrary, capricious, or

manifestly contrary to the statute. *Id.* "If Congress has explicitly left a gap for the agency to fill,

there is an express delegation of authority to the agency to elucidate a specific provision of the

statute by regulation. . . . Sometimes the legislative delegation to an agency on a particular

question is implicit rather than explicit. In such a case, a court may not substitute its own

construction of a statutory provision for a reasonable interpretation made by the administrator of

an agency." *Harbert v. Healthcare Servs. Group, Inc.*, 391 F.3d 1140, 1147 (10th Cir. 2004)

(quoting *Chevron*, 467 U.S. at 843-44).

The SBA was delegated broad authority to implement its lending programs and the

bankruptcy exclusion falls within this authority. The SBA Administrator is explicitly empowered

to "make such rules and regulations as [she] deems necessary to carry out the authority vested in

---

[3] The PPP Application Form includes other limitations not specifically addressed in the CARES
Act. For instance, the PPP excludes entities that have been debarred from federal programs.

[her]," and in addition to "take any and all actions … [that] [she] determines … are necessary or desirable in making … loans." 15 U.S.C. § 634(b)(6), (7). The CARES Act did not amend or otherwise limit this authority. Instead, Congress explicitly included the PPP in the section 7(a) lending program, thus vesting the Administrator with broad discretion over the PPP. Indeed, rather than curtailing the Administrator discretion over the PPP, the CARES Act expanded it, by giving the Administrator authority to issue new regulations and rules to implement the PPP without complying with typical notice and comment requirements. CARES Act § 1114.

The Administrator exercised this explicit delegation of authority to issue two rules addressing the bankruptcy exclusion. The First Interim Final Rule incorporated the PPP Application Form and the bankruptcy exclusion provided on that form. The Fourth Interim Final Rule further addresses ineligibility of entities in active bankruptcy and describes the policy reason animating that agency decision.

Nothing in the CARES Act precludes excluding bankrupt entities from the PPP; the law instead gives the Administrator broad discretion to consider bankruptcy status. First, even before the CARES Act, the Section 7(a) lending procedures explicitly considered the applicants' bankruptcy status to ensure that loans be of "sound value ... as reasonably to assure repayment." 15 U.S.C. 636(a)(6); SOP 50-10; SBA Form 1919 (Questions 6 and 24, which unlimited in time frame ("ever") and cover not only the applicant and its owners, but also affiliates and any businesses controlled by any of the applicant's principals).[4]

---

[4] It is not unreasonable for SBA to consider that applicants in bankruptcy present potentially greater credit risks.  *See, e.g*., Michelle M. Arnopol, *Why Have Chapter 11 Bankruptcies Failed So Miserably: A Reappraisal of Congressional Attempts to Protect a Corporation's Net Operating Losses after Bankruptcy*, Vol. 68 Notre Dame L.R. 133 (April 2014) (https://scholarship.law.nd.edu/ndlr/vol68/iss1/6/).

In comparison to SBA Form 1919 for regular 7(a) loans, SBA Form 2483 has a single question about bankruptcy.  It is far more limited in time (applies only to "presently") and applies only to the applicant and its owners. Keeping a single, and more narrowed, question about bankruptcy on SBA Form 2483 is not arbitrary and capricious. It is directly traceable to an existing application form in the 7(a) loan program that contained questions about bankruptcy that far exceeded the scope of the question for a PPP loan.

Those pre-existing bankruptcy questions were streamlined because of SBA's determination to have PPP loans processed "expeditiously."  First Interim Final Rule at 20811. SBA decided that lenders would not perform an individual credit assessment on each PPP loan as with other 7(a) loans. That is one of the reasons SBA determined to exclude a class of borrowers that presents undue credit risk.

The CARES Act did not amend the "*shall*" requirement in 15 U.S.C. 636(a)(6) that loans be of "sound value." The CARES Act instead explicitly left that provision unaltered, along with Section 7(a) lending procedures more broadly, except where specifically altered. CARES Act § 1102(a)(2) (providing that "[e]xcept as otherwise provided in this paragraph, the Administrator may guarantee covered loans under the same terms, conditions, and processes as a loan made under this subsection."); 15 U.S.C. § 636(a)(36)(B). SBA was required to make decisions about how to reconcile the "shall" requirement concerning the sound value of loan-making within the overall context of the CARES Act.

To implement the PPP, the Administrator determined that the regular section 7(a) lending requirements should be "streamlined" by eliminating case-by-case underwriting and replacing it with questions on the PPP Application Form, including the bankruptcy exclusion question. That

decision falls squarely within the SBA's broad discretion over its lending programs, and within the further delegation of emergency rulemaking authority provided by the CARES Act.

### D.   Plaintiff's Claim for Mandamus Will Fail Because Congress Delegated Discretion to Implement the PPP.

"Mandamus relief is an appropriate remedy to compel an administrative agency to act where it has failed to perform a nondiscretionary, ministerial duty." *Marathon Oil Co. v. Lujan*, 937 F.2d 498, 500 (10th Cir. 1991). However, "the remedy of mandamus is a drastic one, to be invoked only in extraordinary circumstances." *Wilder v. Prokop*, 846 F.2d 613, 620 (10th Cir. 1988) (citations omitted). The Court, in evaluating a writ of mandamus action, must consider three prerequisites before exercising its discretion in determining whether to issue the writ: (1) Plaintiffs must have "a clear right to relief," (2) the Defendants' "duty to perform the act in question is plainly defined and peremptory," as well as non-discretionary and ministerial, and (3) Plaintiffs have "no other adequate remedy." *Schoenrogge v. Rooney*, 255 F. App'x 324, 325-26 (10th Cir. 2007) (citing *Rios v. Ziglar*, 398 F.3d 1201, 1206 (10th Cir. 2005)). Further, "[g]eneral claims of agency overreaching are simply insufficient to create a legal duty under the Mandamus Act." *Dunn-McCampbell Royalty Interest, Inc. v. National Park Service*, 112 F.3d 1283, 1288 (10th Cir. 1997).

Plaintiff has not even attempted to establish any of these elements and thus cannot demonstrate entitlement to the drastic remedy of mandamus. Moreover, implementing the PPP is far from a ministerial, non-discretionary act. The CARES Act, for instance, does not describe the application form or process in any detail. Congress instead created the PPP through the existing section 7(a) lending program, over which the Administrator has broad discretion. *See supra* 1288. Congress then gave the Administrator emergency rule making authority to implement the PPP. *Id*. This discretion delegated by Congress defeats any claim to mandamus.

18

### III.    PLAINTIFF HAS NOT ESTABLISHED IRREPARABLE HARM.

Plaintiff fails to allege facts demonstrating that they would be irreparably injured by Defendants' actions in the absence of prospective injunctive relief. Instead Plaintiff alleges only the barest conclusory statements. This does not suffice.

"To constitute irreparable harm, an injury must be certain, great, actual and not theoretical." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (citing *Wisconsin Gas Co. v. FERC,* 758 F.2d 669, 674 (D.C.Cir.1985) and *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001)). "Irreparable harm is not harm that is 'merely serious or substantial.'" *Id.* at 1189 (quoting *Prairie Band,* 253 F.3d at 1250 and *A.O. Smith Corp. v. FTC,* 530 F.2d 515, 525 (3d Cir.1976)). "The party seeking injunctive relief must show that the injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Id.* (quoting *Prairie Band* at 1250). "It is also well settled that simple economic loss usually does not, in and of itself, constitute irreparable harm." *Id.* (citing 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2948.1, at 152–53 (2d ed.1995)).

Plaintiff alleges less still about the consequences to Plaintiff if an injunction is denied. The Complaint flatly asserts that "[plaintiff] will run out of money to pay ongoing expenses by early June if it is unable to obtain funds from PPP or other sources …which would result in Debtor being forced to immediately close its business without sufficient funds for an orderly wind-down.  This would cause irreparable harm to the Debtor." Compl. ¶ 31. Plaintiff also alleges that the "inability to obtain PPP funds could cause the Debtor to suffer immediate and irreparable harm by forcing the Debtor to liquidate." Compl. ¶ 37 Plaintiff does not explain at all how failure to get a PPP loan will impact the bankruptcy estate or alter the Chapter 11

administration, nor does plaintiff explain why that effect is irreparably harmful. Instead Plaintiff

speculates that without the PPP loan by mid-June it will run out of funds.

In the motion for the temporary restraining order, plaintiff asserts that the "stay-at-home

orders issued by the Governor of the State of Maine, [directing that] non-essential medical

procedures and office visits [be] postponed, rescheduled or canceled has caused Plaintiff to lose

an income stream.  These cancellations and deferrals have had—and are expected to continue to

have—a negative impact on the Debtor's cash receipts." TRO ¶ 10.  However, the referenced

stay at home orders expire this week, making this assertion unsupportable.  Thus, even if plaintiff

can prove the assertions in its complaint, those assertions do not come close to demonstrating

irreparable harm.

## IV.    THE PUBLIC INTEREST WEIGHS AGAINST ENJOINING THE SBA.

Finally, to obtain preliminary injunctive relief in a case against the Government,

Plaintiffs must show that the sweeping injunction they seek would be in the public interest. *Nken*,

556 U.S. at 435. Plaintiffs cannot make that showing for at least three reasons: (1) the resolution

of complex and competing policy interests at stake in administering the PPP is best left to

Congress and the SBA; (2) the SBA has already determined that it should apply eligibility

restrictions contrary to those Plaintiffs prefer when administering the PPP and Congress has

determined that the SBA's implementation of the PPP should not be subject to injunction; and

(3) the relief Plaintiff seeks has "potentially unknowable effects." *Profiles, Inc. v. Bank of Am.*

*Corp.*, 2020 WL 1849710, at *11 (D. Md. Apr. 13, 2020).

First, if granted, Plaintiffs' proposed injunction would short-circuit the rapidly-evolving

political and administrative landscape of responding to COVID-19. Plaintiff seeks broad,

nationwide relief "enjoining SBA or any commercial lender from denying an application under

PPP on the basis that the applicant is a debtor in bankruptcy" and asks the Court to "enjoin SBA

from issuing loan guaranties or approving PPP applications in an amount that would leave

insufficient funds for the Debtor's funding" Compl. ¶¶ A & B in Relief Requested. But during

this unprecedented situation, the public interest is best served by permitting the SBA to carry out

the duties Congress assigned it, namely ensuring the swift flow of loan guarantees that Congress

has deemed essential to protecting small businesses and the overall economy, in accordance with

the law. As one court has already observed, "given the competing policy interests, the need to

balance the desire to assist the widest swath of small businesses with the need to incentivize

lender participation, and the overall fluidity of this epidemic, Congress is better positioned to

remedy any defects in the CARES Act, and to pass the supplemental legislation it believes best

aimed at ameliorating the effects of the COVID-19 crisis." *Profiles,* 2020 WL 1894970 at *12. In

short, Plaintiffs' TRO "may undermine Congress's goal to maximize relief for American small

businesses" and therefore run directly counter to the public interest. *Profiles,* at *11; *see Am.

Ass'n of Political Consultants v. SBA*, 2020 WL 1935525, at *7 (D.D.C. Apr. 21, 2020) (denying

a TRO motion seeking to overturn the prohibition on political or lobbying groups from receiving

section 7(a) loans).

Second, imposing Plaintiff's requested injunction would reverse the SBA's stated policy

preference, which Congress chose to make immune from injunction. The SBA has a clear policy

to exclude bankrupt entities from PPP lending because such lending "would present an

unacceptably high risk of an unauthorized use of funds or non-repayment of unforgiven loans."

The Plaintiff wishes to replace this judgment with its own policy preference. But Congress chose

to empower the SBA to implement the PPP, thus its policy carries the force of law. Congress

also chose to immunize the SBA from injunctive relief. Issuing an injunction here would run

directly against that public policy, *see supra* at *11, which provides further proof that the balance

of the equities must be struck in the Government's favor. "Thus, issuing the injunction Plaintiff

seeks would represent precisely the sort of interference with Defendants' statutory obligations

that runs contrary to the public interest. *Cf. id.* at *11 (finding that "Congress's statutory scheme

would be further frustrated" by preliminary injunctive relief altering the scheme).

Third, as another court has already explained, the broad injunctive relief Plaintiff seeks

could "have consequences reaching far beyond the litigants in this particular case." *Profiles, Inc.*,

2020 WL 1849710, at *11. Its impacts would cost "valuable time" for both Congress and

Defendants to effectively respond to changing circumstances and for small businesses applying

for current or potential future PPP loans to receive funds. *Id.* In short, a TRO here would throw a

wrench into policymakers' evolving responses to the pandemic's economic fallout and would

adversely affect thousands of small businesses that need help now. In these circumstances, "[t]he

proper balance between the competing and compelling public interests implicated in this

incredibly complex situation must be struck by the legislative branch." *Id.* at *4.Under these

unprecedented circumstances, the Court should strike the balance in the Government's favor and

deny Plaintiffs' unprecedented requests for preliminary injunctive relief.

## V.      PLAINTIFF MAY NOT SEEK RELIEF ON BEHALF OF OTHERS.

Plaintiff seeks relief that impacts all PPP applicants with its request that the preliminary

injunction enjoin "SBA from issuing loan guaranties or approving PPP applications" and

enjoining SBA from "denying an application under PPP on the basis that the applicant is a debtor

in bankruptcy…" Compl. ¶¶ A-C. But, even if plaintiff were entitled to relief – it is not – it lacks

standing to seek an injunction on behalf of others. *See Gill v. Whitford*, 138 S. Ct. 1916 (2018)

([A] plaintiff's remedy must be limited to the inadequacy that produced his injury in

fact."(internal marks omitted)) (rejecting standing for a statewide gerrymandering challenge

because a plaintiff's remedy must be limited to his injury).

Further, "[i]t is well settled an injunction must be narrowly tailored to remedy the harm

shown." *Garrison v. Baker Hughes Oilfield Operations, Inc.*, 287 F.3d 955, 962 (10th Cir. 2002)

(collecting cases). The requested nationwide injunction goes far beyond the minimum necessary

to preserve Plaintiff's claims until a final decision is entered on the merits, and thus should be

denied.

## CONCLUSION

For the foregoing reasons, plaintiff's request for a temporary restraining order should be

denied.

Dated: April 29, 2020                    Respectfully submitted,


                                         JOSEPH H. HUNT
                                         Assistant Attorney General

                                         */s/ Dominique V. Sinesi*
                                         RUTH A. HARVEY
                                         Director
                                         MARGARET M. NEWELL
                                         Assistant Director
                                         Dominique V. Sinesi
                                         (VSB No 28707)
                                         Trial Attorney
                                         Department of Justice
                                         Commercial Litigation Branch,
                                         Civil Division
                                         P.O. Box 875, Ben Franklin Station
                                         Washington, DC 20044-0875
                                         TEL: (202) 514-3368

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 29, 2020, I electronically filed the foregoing OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all CM/ECF participants.

*/s/ Kevin P. VanLandingham*
KEVIN P. VANLANDINGHAM
Commercial Litigation Branch
Civil Division
United States Department of Justice