# PVH213 – April 20 Rule (SBA)

Where:

$\dot{m}_{SD}$ = dry air mass flow rate of infiltration air for single-duct portable air conditioners, in pounds per minute (lb/m).

$\dot{m}_{95}$ and $\dot{m}_{83}$ = dry air mass flow rate of infiltration air for dual-duct portable air conditioners, as calculated based on testing according to the test conditions in Table 1 of this appendix, in lb/m.

$V_{co\_SD}$, $V_{co\_95}$, and $V_{co\_83}$ = average volumetric flow rate of the condenser outlet air during cooling mode testing for single-duct portable air conditioners; and at the 95 °F and 83 °F dry-bulb outdoor conditions for dual-duct portable air conditioners, respectively, in cubic feet per minute (cfm).

$V_{ci\_95}$ and $V_{ci\_83}$ = average volumetric flow rate of the condenser inlet air during cooling mode testing at the 95 °F and 83 °F dry-bulb outdoor conditions for dual-duct portable air conditioners, respectively, in cfm.

$\rho_{co\_SD}$, $\rho_{co\_95}$, and $\rho_{co\_83}$ = average density of the condenser outlet air during cooling mode testing for single-duct portable air conditioners, and at the 95 °F and 83 °F dry-bulb outdoor conditions for dual-duct portable air conditioners, respectively, in pounds mass per cubic foot (lb$_m$/ft$^3$).

$\rho_{ci\_95}$ and $\rho_{ci\_83}$ = average density of the condenser inlet air during cooling mode testing at the 95 °F and 83 °F dry-bulb outdoor conditions for dual-duct portable air conditioners, respectively, in lb$_m$/ft$^3$.

$\omega_{co\_SD}$, $\omega_{co\_95}$, and $\omega_{co\_83}$ = average humidity ratio of condenser outlet air during cooling mode testing for single-duct portable air conditioners, and at the 95 °F and 83 °F dry-bulb outdoor conditions for dual-duct portable air conditioners, respectively, in pounds mass of water vapor per pounds mass of dry air (lb$_w$/lb$_{da}$).

$\omega_{ci\_95}$ and $\omega_{ci\_83}$ = average humidity ratio of condenser inlet air during cooling mode testing at the 95 °F and 83 °F dry-bulb outdoor conditions for dual-duct portable air conditioners, respectively, in lb$_w$/lb$_{da}$.

For single-duct and dual-duct portable air conditioners, calculate the sensible component of infiltration air heat contribution according to:

$$Q_{s\_95} = \dot{m} \times 60 \times [(c_{p\_da} \times (T_{ia\_95} - T_{indoor}) + (c_{p\_wv} \times (\omega_{ia\_95} \times T_{ia\_95} - \omega_{indoor} \times T_{indoor}))]$$
$$Q_{s\_83} = \dot{m} \times 60 \times [(c_{p\_da} \times (T_{ia\_83} - T_{indoor}) + (c_{p\_wv} \times (\omega_{ia\_83} \times T_{ia\_83} - \omega_{indoor} \times T_{indoor}))]$$

Where:

$Q_{s\_95}$ and $Q_{s\_83}$ = sensible heat added to the room by infiltration air, calculated at the 95 °F and 83 °F dry-bulb outdoor conditions in Table 1 of this appendix, in Btu/h.

$\dot{m}$ = dry air mass flow rate of infiltration air, $\dot{m}_{SD}$ or $\dot{m}_{95}$ when calculating $Q_{s\_95}$ and $\dot{m}_{SD}$ or $\dot{m}_{83}$ when calculating $Q_{s\_83}$, in lb/m.

$c_{p\_da}$ = specific heat of dry air, 0.24 Btu/lb$_m$-°F.

$c_{p\_wv}$ = specific heat of water vapor, 0.444 Btu/lb$_m$-°F.

$T_{indoor}$ = indoor chamber dry-bulb temperature, 80 °F.

$T_{ia\_95}$ and $T_{ia\_83}$ = infiltration air dry-bulb temperatures for the two test conditions in Table 1 of this appendix, 95 °F and 83 °F, respectively.

$\omega_{ia\_95}$ and $\omega_{ia\_83}$ = humidity ratios of the 95 °F and 83 °F dry-bulb infiltration air, 0.0141 and 0.01086 lb$_w$/lb$_{da}$, respectively.

$\omega_{indoor}$ = humidity ratio of the indoor chamber air, 0.0112 lb$_w$/lb$_{da}$.

60 = conversion factor from minutes to hours.

Calculate the latent heat contribution of the infiltration air according to:

$$Q_{L\_95} = \dot{m} \times 60 \times H_{fg} \times (\omega_{ia\_95} - \omega_{indoor})$$
$$Q_{L\_83} = \dot{m} \times 60 \times H_{fg} \times (\omega_{ia\_83} - \omega_{indoor})$$

Where:

$Q_{L\_95}$ and $Q_{L\_83}$ = latent heat added to the room by infiltration air, calculated at the 95 °F and 83 °F dry-bulb outdoor conditions in Table 1 of this appendix, in Btu/h.

$\dot{m}$ = mass flow rate of infiltration air, $\dot{m}_{SD}$ or $\dot{m}_{95}$ when calculating $Q_{L\_95}$ and $\dot{m}_{SD}$ or $\dot{m}_{83}$ when calculating $Q_{L\_83}$, in lb/m.

$H_{fg}$ = latent heat of vaporization for water vapor, 1061 Btu/lb$_m$.

$\omega_{ia\_95}$ and $\omega_{ia\_83}$ = humidity ratios of the 95 °F and 83 °F dry-bulb infiltration air, 0.0141 and 0.01086 lb$_w$/lb$_{da}$, respectively.

$\omega_{indoor}$ = humidity ratio of the indoor chamber air, 0.0112 lb$_w$/lb$_{da}$.

60 = conversion factor from minutes to hours.

The total heat contribution of the infiltration air is the sum of the sensible and latent heat:

$$Q_{infiltration\_95} = Q_{s\_95} + Q_{L\_95}$$
$$Q_{infiltration\_83} = Q_{s\_83} + Q_{L\_83}$$

Where:

$Q_{infiltration\_95}$ and $Q_{infiltration\_83}$ = total infiltration air heat in cooling mode, calculated at the 95 °F and 83 °F dry-bulb outdoor conditions in Table 1 of this appendix, in Btu/h.

$Q_{s\_95}$ and $Q_{s\_83}$ = sensible heat added to the room by infiltration air, calculated at the 95 °F and 83 °F dry-bulb outdoor conditions in Table 1 of this appendix, in Btu/h.

$Q_{L\_95}$ and $Q_{L\_83}$ = latent heat added to the room by infiltration air, calculated at the 95 °F and 83 °F dry-bulb outdoor conditions in Table 1 of this appendix, in Btu/h.

*     *     *     *     *

[FR Doc. 2020–07733 Filed 4–17–20; 8:45 am]

**BILLING CODE 6450–01–P**

---

# SMALL BUSINESS ADMINISTRATION

## 13 CFR Part 120

**[Docket Number SBA–2020–0020]**

**RIN 3245–AH36**

## Business Loan Program Temporary Changes; Paycheck Protection Program—Additional Eligibility Criteria and Requirements for Certain Pledges of Loans

**AGENCY:** U. S. Small Business Administration.

**ACTION:** Interim final rule.

---

**SUMMARY:** On April 2, 2020, the U.S. Small Business Administration (SBA) posted an interim final rule (the First PPP Interim Final Rule) announcing the implementation of sections 1102 and 1106 of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act or the Act). Section 1102 of the Act temporarily adds a new program, titled the "Paycheck Protection Program," to the SBA's 7(a) Loan Program. Section 1106 of the Act provides for forgiveness of up to the full principal amount of qualifying loans guaranteed under the Paycheck Protection Program (PPP). The PPP is intended to provide economic relief to small businesses nationwide adversely impacted by the Coronavirus Disease 2019 (COVID–19). This interim final rule supplements the First PPP Interim Final Rule with guidance for individuals with self-employment income who file a Form 1040, Schedule C. This rule also addresses eligibility issues for certain business concerns and requirements for certain pledges of PPP loans. This interim final rule supplements SBA's implementation of sections 1102 and 1106 of the Act and requests public comment.

**DATES:**

*Effective Date:* This rule is effective April 20, 2020.

*Applicability Date:* This interim final rule applies to applications submitted under the Paycheck Protection Program through June 30, 2020, or until funds made available for this purpose are exhausted.

*Comment Date:* Comments must be received on or before May 20, 2020.

**ADDRESSES:** You may submit comments, identified by number SBA–2020–0020 through the Federal eRulemaking Portal: *http://www.regulations.gov.* Follow the instructions for submitting comments. SBA will post all comments on *www.regulations.gov.* If you wish to submit confidential business information (CBI) as defined in the User Notice at *www.regulations.gov,* please send an email to *ppp-ifr@sba.gov.*

Highlight the information that you consider to be CBI and explain why you believe SBA should hold this information as confidential. SBA will review the information and make the final determination whether it will publish the information.

**FOR FURTHER INFORMATION CONTACT:** A Call Center Representative at 833–572–0502, or the local SBA Field Office; the list of offices can be found at *https:// www.sba.gov/tools/local-assistance/ districtoffices.*

**SUPPLEMENTARY INFORMATION:**

### I. Background Information

On March 13, 2020, President Trump declared the ongoing Coronavirus Disease 2019 (COVID–19) pandemic of sufficient severity and magnitude to warrant an emergency declaration for all States, territories, and the District of Columbia. With the COVID–19 emergency, many small businesses nationwide are experiencing economic hardship as a direct result of the Federal, State, tribal, and local public health measures that are being taken to minimize the public's exposure to the virus. These measures, some of which are government-mandated, are being implemented nationwide and include the closures of restaurants, bars, and gyms. In addition, based on the advice of public health officials, other measures, such as keeping a safe distance from others or even stay-at-home orders, are being implemented, resulting in a dramatic decrease in economic activity as the public avoids malls, retail stores, and other businesses.

On March 27, 2020, the President signed the Coronavirus Aid, Relief, and Economic Security Act (the CARES Act or the Act) (Pub. L. 116–136) to provide emergency assistance and health care response for individuals, families, and businesses affected by the coronavirus pandemic. The Small Business Administration (SBA) received funding and authority through the Act to modify existing loan programs and establish a new loan program to assist small businesses nationwide adversely impacted by the COVID–19 emergency. Section 1102 of the Act temporarily permits SBA to guarantee 100 percent of 7(a) loans under a new program titled the ''Paycheck Protection Program.'' Section 1106 of the Act provides for forgiveness of up to the full principal amount of qualifying loans guaranteed under the Paycheck Protection Program.

### II. Comments and Immediate Effective Date

The intent of the Act is that SBA provide relief to America's small businesses expeditiously. This intent, along with the dramatic decrease in economic activity nationwide, provides good cause for SBA to dispense with the 30-day delayed effective date provided in the Administrative Procedure Act. Specifically, small businesses need to be informed on whether they are eligible to apply for a loan, how to apply for a loan, and the terms of the loan under section 1102 of the Act as soon as possible because the last day to apply for and receive a loan is June 30, 2020. The immediate effective date of this interim final rule will benefit small businesses so that they can immediately determine their eligibility and apply for the loan with a full understanding of loan terms and conditions. This interim final rule is effective without advance notice and public comment because section 1114 of the Act authorizes SBA to issue regulations to implement Title I of the Act without regard to notice requirements. This rule is being issued to allow for immediate implementation of this program. Although this interim final rule is effective immediately, comments are solicited from interested members of the public on all aspects of the interim final rule, including section III below. These comments must be submitted on or before May 20, 2020. SBA will consider these comments and the need for making any revisions as a result of these comments.

### III. Additional Paycheck Protection Program Eligibility Criteria and Requirements for Certain Pledges of Loans

*Overview*

The CARES Act was enacted to provide immediate assistance to individuals, families, and organizations affected by the COVID–19 emergency. Among the provisions contained in the CARES Act are provisions authorizing SBA to temporarily guarantee loans under the Paycheck Protection Program (PPP). Loans under the PPP will be 100 percent guaranteed by SBA, and the full principal amount of the loans and any accrued interest may qualify for loan forgiveness. Additional information about the PPP is available in the First PPP Interim Final Rule (85 FR 20811) and a second interim final rule (85 FR 20817) posted April 3, 2020.

1. Individuals With Self-Employment Income Who File a Form 1040, Schedule C

*a. I have income from self-employment and file a Form 1040, Schedule C. Am I eligible for a PPP Loan?*

You are eligible for a PPP loan if: (i) You were in operation on February 15, 2020; (ii) you are an individual with self-employment income (such as an independent contractor or a sole proprietor); (iii) your principal place of residence is in the United States; and (iv) you filed or will file a Form 1040 Schedule C for 2019. However, if you are a partner in a partnership, you may not submit a separate PPP loan application for yourself as a self-employed individual. Instead, the self-employment income of general active partners may be reported as a payroll cost, up to $100,000 annualized, on a PPP loan application filed by or on behalf of the partnership. Partnerships are eligible for PPP loans under the Act, and the Administrator has determined, in consultation with the Secretary of the Treasury (Secretary), that limiting a partnership and its partners (and an LLC filing taxes as a partnership) to one PPP loan is necessary to help ensure that as many eligible borrowers as possible obtain PPP loans before the statutory deadline of June 30, 2020. This limitation will allow lenders to more quickly process applications and lower the burdens of applying for partnerships/partners. The Administrator has further determined that permitting partners to apply as self-employed individuals would create unnecessary confusion regarding which entity, the partner or the partnership, applies for partner and LLC member income, and would generate loan proceeds use coordination and allocation issues. Rent, mortgage interest, utilities, and other debt service are generally incurred at the partnership level, not partner level, so it is most natural to provide the funds for these expenses to the partnership, not individual partners. In addition, you should be aware that participation in the PPP may affect your eligibility for state-administered unemployment compensation or unemployment assistance programs, including the programs authorized by Title II, Subtitle A of the CARES Act, or CARES Act Employee Retention Credits. SBA will issue additional guidance for those individuals with self-employment income who: (i) Were not in operation in 2019 but who were in operation on February 15, 2020, and (ii) will file a Form 1040 Schedule C for 2020.

*b. How do I calculate the maximum amount I can borrow and what documentation is required?*

How you calculate your maximum loan amount depends upon whether or not you employ other individuals. If you have no employees, the following methodology should be used to calculate your maximum loan amount:

i. Step 1: Find your 2019 IRS Form 1040 Schedule C line 31 net profit amount (if you have not yet filed a 2019 return, fill it out and compute the value). If this amount is over $100,000, reduce it to $100,000. If this amount is zero or less, you are not eligible for a PPP loan.

ii. Step 2: Calculate the average monthly net profit amount (divide the amount from Step 1 by 12).

iii. Step 3: Multiply the average monthly net profit amount from Step 2 by 2.5.

iv. Step 4: Add the outstanding amount of any Economic Injury Disaster Loan (EIDL) made between January 31, 2020 and April 3, 2020 that you seek to refinance, less the amount of any advance under an EIDL COVID–19 loan (because it does not have to be repaid).

Regardless of whether you have filed a 2019 tax return with the IRS, you must provide the 2019 Form 1040 Schedule C with your PPP loan application to substantiate the applied-for PPP loan amount and a 2019 IRS Form 1099–MISC detailing nonemployee compensation received (box 7), invoice, bank statement, or book of record that establishes you are self-employed. You must provide a 2020 invoice, bank statement, or book of record to establish you were in operation on or around February 15, 2020.

If you have employees, the following methodology should be used to calculate your maximum loan amount:

i. Step 1: Compute 2019 payroll by adding the following:

a. Your 2019 Form 1040 Schedule C line 31 net profit amount (if you have not yet filed a 2019 return, fill it out and compute the value), up to $100,000 annualized, if this amount is over $100,000, reduce it to $100,000, if this amount is less than zero, set this amount at zero;

b. 2019 gross wages and tips paid to your employees whose principal place of residence is in the United States computed using 2019 IRS Form 941 Taxable Medicare wages & tips (line 5c—column 1) from each quarter plus any pre-tax employee contributions for health insurance or other fringe benefits excluded from Taxable Medicare wages & tips; subtract any amounts paid to any individual employee in excess of $100,000 annualized and any amounts

paid to any employee whose principal place of residence is outside the United States; and

c. 2019 employer health insurance contributions (health insurance component of Form 1040 Schedule C line 14), retirement contributions (Form 1040 Schedule C line 19), and state and local taxes assessed on employee compensation (primarily under state laws commonly referred to as the State Unemployment Tax Act or SUTA from state quarterly wage reporting forms).

ii. Step 2: Calculate the average monthly amount (divide the amount from Step 1 by 12).

iii. Step 3: Multiply the average monthly amount from Step 2 by 2.5.

iv. Step 4: Add the outstanding amount of any EIDL made between January 31, 2020 and April 3, 2020 that you seek to refinance, less the amount of any advance under an EIDL COVID–19 loan (because it does not have to be repaid).

You must supply your 2019 Form 1040 Schedule C, Form 941 (or other tax forms or equivalent payroll processor records containing similar information) and state quarterly wage unemployment insurance tax reporting forms from each quarter in 2019 or equivalent payroll processor records, along with evidence of any retirement and health insurance contributions, if applicable. A payroll statement or similar documentation from the pay period that covered February 15, 2020 must be provided to establish you were in operation on February 15, 2020.

d. How can PPP loans be used by individuals with income from self-employment who file a 2019 Form 1040, Schedule C?

The proceeds of a PPP loan are to be used for the following.

i. Owner compensation replacement, calculated based on 2019 net profit as described in Paragraph 1.b. above.

ii. Employee payroll costs (as defined in the First PPP Interim Final Rule) for employees whose principal place of residence is in the United States, if you have employees.

iii. Mortgage interest payments (but not mortgage prepayments or principal payments) on any business mortgage obligation on real or personal property (*e.g.,* the interest on your mortgage for the warehouse you purchased to store business equipment or the interest on an auto loan for a vehicle you use to perform your business), business rent payments (*e.g.,* the warehouse where you store business equipment or the vehicle you use to perform your business), and business utility payments (*e.g.,* the cost of electricity in the warehouse you rent or gas you use

driving your business vehicle). You must have claimed or be entitled to claim a deduction for such expenses on your 2019 Form 1040 Schedule C for them to be a permissible use during the eight-week period following the first disbursement of the loan (the "covered period"). For example, if you did not claim or are not entitled to claim utilities expenses on your 2019 Form 1040 Schedule C, you cannot use the proceeds for utilities during the covered period.

iv. Interest payments on any other debt obligations that were incurred before February 15, 2020 (such amounts are not eligible for PPP loan forgiveness).

v. Refinancing an SBA EIDL loan made between January 31, 2020 and April 3, 2020 (maturity will be reset to PPP's maturity of two years). If you received an SBA EIDL loan from January 31, 2020 through April 3, 2020, you can apply for a PPP loan. If your EIDL loan was not used for payroll costs, it does not affect your eligibility for a PPP loan. If your EIDL loan was used for payroll costs, your PPP loan must be used to refinance your EIDL loan. Proceeds from any advance up to $10,000 on the EIDL loan will be deducted from the loan forgiveness amount on the PPP loan.

The Administrator, in consultation with the Secretary, determined that it is appropriate to limit self-employed individuals' (who file a Form 1040 Schedule C) use of loan proceeds to those types of allowable uses for which the borrower made expenditures in 2019. The Administrator has determined that this limitation on self-employed individuals who file a Form 1040 Schedule C is consistent with the borrower certification required by the Act; specifically, that the PPP loan is necessary "to support the ongoing operations" of the borrower. The Administrator and the Secretary thus believe that this limitation is consistent with the structure of the Act to maintain existing operations and payroll and not for business expansion. This limitation on the use of PPP loan proceeds will also help to ensure that the finite appropriations available for these loans are directed toward maintaining existing operations and payroll, as each loan that is made depletes the appropriation. Finally, although the Act makes businesses in operation on February 15, 2020 eligible for PPP loans, the Administrator, in consultation with the Secretary, has determined that self-employed individuals will need to rely on their 2019 Form 1040 Schedule C, which provides verifiable documentation on expenses between January 1, 2019 and December 31, 2019.

For individuals with income from self-employment from 2019 for which they have filed or will file a 2019 Form 1040 Schedule C, expenses incurred between January 1, 2020 and February 14, 2020 may not be considered because of the lack of verifiable documentation on expenses in this period. SBA will issue additional guidance for those individuals with self-employment income who: (i) Were not in operation in 2019 but who were in operation on February 15, 2020, and (ii) will file a Form 1040 Schedule C for 2020.

*e. Are there any other restrictions on how I can use PPP loan proceeds?*

Yes. At least 75 percent of the PPP loan proceeds shall be used for payroll costs. For purposes of determining the percentage of use of proceeds for payroll costs (but not for forgiveness purposes), the amount of any refinanced EIDL will be included. The rationale for this 75 percent floor is contained in the First PPP Interim Final Rule.

*f. What amounts shall be eligible for forgiveness?*

The amount of loan forgiveness can be up to the full principal amount of the loan plus accrued interest. The actual amount of loan forgiveness will depend, in part, on the total amount spent over the covered period on:

i. Payroll costs including salary, wages, and tips, up to $100,000 of annualized pay per employee (for eight weeks, a maximum of $15,385 per individual), as well as covered benefits for employees (but not owners), including health care expenses, retirement contributions, and state taxes imposed on employee payroll paid by the employer (such as unemployment insurance premiums);

ii. owner compensation replacement, calculated based on 2019 net profit as described in Paragraph 1.b. above, with forgiveness of such amounts limited to eight weeks' worth (8/52) of 2019 net profit, but excluding any qualified sick leave equivalent amount for which a credit is claimed under section 7002 of the Families First Coronavirus Response Act (FFCRA) (Pub. L. 116–127) or qualified family leave equivalent amount for which a credit is claimed under section 7004 of FFCRA;

iii. payments of interest on mortgage obligations on real or personal property incurred before February 15, 2020, to the extent they are deductible on Form 1040 Schedule C (business mortgage payments);

iv. rent payments on lease agreements in force before February 15, 2020, to the extent they are deductible on Form 1040 Schedule C (business rent payments); and

v. utility payments under service agreements dated before February 15, 2020 to the extent they are deductible on Form 1040 Schedule C (business utility payments).

The Administrator, in consultation with the Secretary, has determined that it is appropriate to limit the forgiveness of owner compensation replacement for individuals with self-employment income who file a Schedule C to eight weeks' worth (8/52) of 2019 net profit. This is most consistent with the structure of the Act and its overarching focus on keeping workers paid, and will prevent windfalls that Congress did not intend.

Congress determined that the maximum loan amount is based on 2.5 months of the borrower's payroll during the one-year period preceding the loan.

Congress also determined that the maximum amount of loan forgiveness is based on the borrower's eligible payments—*i.e.,* the sum of payroll costs and certain overhead expenses—over the eight-week period following the date of loan disbursement. For individuals with self-employment income who file a Schedule C, the Administrator, in consultation with the Secretary, has determined that it is appropriate to limit loan forgiveness to a proportionate eight-week share of 2019 net profit, as reflected in the individual's 2019 Form 1040 Schedule C. This is because many self-employed individuals have few of the overhead expenses that qualify for forgiveness under the Act. For example, many such individuals operate out of either their homes, vehicles, or sheds and thus do not incur qualifying mortgage interest, rent, or utility payments. As a result, most of their receipts will constitute net income. Allowing such a self-employed individual to treat the full amount of a PPP loan as net income would result in a windfall. The entire amount of the PPP loan (a maximum of 2.5 times monthly payroll costs) would be forgiven even though Congress designed this program to limit forgiveness to certain eligible expenses incurred in an eight-week covered period. Limiting forgiveness to eight weeks of net profit from the owner's 2019 Form 1040 Schedule C is consistent with the structure of the Act, which provides for loan forgiveness based on eight weeks of expenditures. This limitation will also help to ensure that the finite appropriations are directed toward payroll protection, consistent with the Act's central objective. Finally, 75 percent of the amount forgiven must be attributable to payroll costs for the reasons specified in the First PPP Interim Final Rule.

*g. What documentation will I be required to submit to my lender with my request for loan forgiveness?*

In addition to the borrower certification required by Section 1106(e)(3) of the Act, to substantiate your request for loan forgiveness, if you have employees, you should submit Form 941 and state quarterly wage unemployment insurance tax reporting forms or equivalent payroll processor records that best correspond to the covered period (with evidence of any retirement and health insurance contributions). Whether or not you have employees, you must submit evidence of business rent, business mortgage interest payments on real or personal property, or business utility payments during the covered period if you used loan proceeds for those purposes.

The 2019 Form 1040 Schedule C that was provided at the time of the PPP loan application must be used to determine the amount of net profit allocated to the owner for the eight-week covered period. The Administrator, in consultation with the Secretary, determined that for purposes of loan forgiveness it is appropriate to require self-employed individuals to rely on the 2019 Form 1040 Schedule C to determine the amount of net profit allocated to the owner during the covered period for the reasons described in Paragraph 1.d. above.

2. Clarification Regarding Eligible Businesses

*a. Are eligible businesses owned by directors or shareholders of a PPP Lender permitted to apply for a PPP Loan through the Lender with which they are associated?*

The Administrator recognizes that, unlike other SBA loan programs, the financial terms for PPP Loans are uniform for all borrowers, and the standard underwriting process does not apply because no creditworthiness assessment is required for PPP Loans. Consequently, there is no meaningful risk of underwriting bias or below-market rates and terms. The Administrator also recognizes that many directors and equity holders of PPP Lenders are owners of unrelated businesses. For those reasons, the Administrator, in consultation with the Secretary, has determined that SBA regulations (including 13 CFR 120.110 and 120.140) shall not apply to prohibit an otherwise eligible business owned (in whole or part) by an outside director or holder of a less than 30 percent equity interest in a PPP Lender from obtaining a PPP loan from the PPP Lender on whose board the director serves or in which the equity owner

holds an interest, provided that the eligible business owned by the director or equity holder follows the same process as any similarly situated customer or account holder of the Lender. Favoritism by the Lender in processing time or prioritization of the director's or equity holder's PPP application is prohibited. The Administrator cautions, however, that Lenders should comply with all other applicable state and federal regulations concerning loans to associates of the Lender. Lenders should also consult their own internal policies concerning lending to individuals or entities associated with the Lender.

The foregoing paragraph does not apply to a director or owner who is also an officer or key employee of the PPP Lender. Officers and key employees of a PPP Lender may obtain a PPP Loan from a different lender, but not from the PPP Lender with which they are associated. SBA also reminds Lenders that the ''Authorized Lender Official'' for each PPP Loan is subject to the limitations described in the Lender Application Form, which states in relevant part: ''Neither the undersigned Authorized Lender Official, nor such individual's spouse or children, has a financial interest in the Applicant [Borrower].''

*b. Are businesses that receive revenue from legal gaming eligible for a PPP Loan?*

A business that is otherwise eligible for a PPP Loan is not rendered ineligible due to its receipt of legal gaming revenues if the existing standard in 13 CFR 120.110(g) is met or the following two conditions are satisfied: (a) The business's legal gaming revenue (net of payouts but not other expenses) did not exceed $1 million in 2019; and (b) legal gaming revenue (net of payouts but not other expenses) comprised less than 50 percent of the business's total revenue in 2019. Businesses that received illegal gaming revenue are categorically ineligible. The Administrator, in consultation with the Secretary, believes this test appropriately balances the longstanding policy reasons for limiting lending to businesses primarily and substantially engaged in gaming activity with the policy aim of making the PPP Loan available to a broad segment of U.S. businesses and their employees.

3. Requirements for Certain Pledges of PPP Loans

*Do the requirements for loan pledges under 13 CFR 120.434 apply to PPP loans pledged for borrowings from a Federal Reserve Bank (FRB) or advances by a Federal Home Loan Bank (FHLB)?*

No. Pursuant to SBA regulations at 13 CFR 120.435(d) and (e), a pledge of 7(a) loans to a FRB or FHLB does not require SBA's prior written consent or notice to SBA. SBA, in consultation with Treasury, has determined that for purposes of loans made under the PPP, the additional requirements set forth in 120.434 shall also not apply. This would mean, for example, that SBA would not have to approve loan documents or require a multi-party agreement among SBA, the lender, and others.

4. Additional Information

SBA may provide further guidance, if needed, through SBA notices that will be posted on SBA's website at *www.sba.gov.* Questions on the Paycheck Protection Program may be directed to the Lender Relations Specialist in the local SBA Field Office. The local SBA Field Office may be found at *https://www.sba.gov/tools/local-assistance/districtoffices.*

**Compliance With Executive Orders 12866, 12988, 13132, 13563, and 13771, the Paperwork Reduction Act (44 U.S.C. Ch. 35), and the Regulatory Flexibility Act (5 U.S.C. 601–612)**

*Executive Orders 12866, 13563, and 13771*

This interim final rule is economically significant for the purposes of Executive Orders 12866 and 13563, and is considered a major rule under the Congressional Review Act. SBA, however, is proceeding under the emergency provision at Executive Order 12866 Section 6(a)(3)(D) based on the need to move expeditiously to mitigate the current economic conditions arising from the COVID–19 emergency. This rule's designation under Executive Order 13771 will be informed by public comment.

*Executive Order 12988*

SBA has drafted this rule, to the extent practicable, in accordance with the standards set forth in section 3(a) and 3(b)(2) of Executive Order 12988, to minimize litigation, eliminate ambiguity, and reduce burden. The rule has no preemptive or retroactive effect.

*Executive Order 13132*

SBA has determined that this rule will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various layers of government. Therefore, SBA has determined that this rule has no federalism implications warranting preparation of a federalism assessment.

*Paperwork Reduction Act, 44 U.S.C. Chapter 35*

SBA has determined that this rule will not impose new or modify existing recordkeeping or reporting requirements under the Paperwork Reduction Act.

*Regulatory Flexibility Act (RFA)*

The Regulatory Flexibility Act (RFA) generally requires that when an agency issues a proposed rule, or a final rule pursuant to section 553(b) of the APA or another law, the agency must prepare a regulatory flexibility analysis that meets the requirements of the RFA and publish such analysis in the **Federal Register.** 5 U.S.C. 603, 604. Specifically, the RFA normally requires agencies to describe the impact of a rulemaking on small entities by providing a regulatory impact analysis. Such analysis must address the consideration of regulatory options that would lessen the economic effect of the rule on small entities. The RFA defines a ''small entity'' as (1) a proprietary firm meeting the size standards of the Small Business Administration (SBA); (2) a nonprofit organization that is not dominant in its field; or (3) a small government jurisdiction with a population of less than 50,000. 5 U.S.C. 601(3)–(6). Except for such small government jurisdictions, neither State nor local governments are ''small entities.'' Similarly, for purposes of the RFA, individual persons are not small entities. The requirement to conduct a regulatory impact analysis does not apply if the head of the agency ''certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities.'' 5 U.S.C. 605(b). The agency must, however, publish the certification in the **Federal Register** at the time of publication of the rule, ''along with a statement providing the factual basis for such certification.'' If the agency head has not waived the requirements for a regulatory flexibility analysis in accordance with the RFA's waiver provision, and no other RFA exception applies, the agency must prepare the regulatory flexibility analysis and publish it in the **Federal Register** at the time of promulgation or, if the rule is promulgated in response to an emergency that makes timely compliance impracticable, within 180 days of publication of the final rule. 5 U.S.C. 604(a), 608(b). Rules that are exempt from notice and comment are also exempt from the RFA requirements, including conducting a regulatory flexibility analysis, when among other things the agency for good cause finds that notice and public procedure are impracticable, unnecessary, or contrary

to the public interest. SBA Office of Advocacy guide: How to Comply with the Regulatory Flexibility Act. Ch.1. p.9. Accordingly, SBA is not required to conduct a regulatory flexibility analysis.

## List of Subjects in 13 CFR Part 120

Community development, Environmental protection, Equal employment opportunity, Exports, Loan programs—business, Reporting and recordkeeping requirements, Small businesses.

For the reasons stated above, the Small Business Administration amends 13 CFR part 120 as set forth below.

## PART 120—BUSINESS LOANS

■ 1. The authority citation for part 120 continues to read as follows:

**Authority:** 15 U.S.C. 634(b)(6), (b)(7), (b)(14), (h), and note, 636(a), (h) and (m), and note, 650, 657t, and note, 657u, and note, 687(f), 696(3) and (7), and note, and 697(a) and (e), and note.

■ 2. Revise § 120.435 to read as follows:

## § 120.435 Which loan pledges do not require notice to or consent by SBA?

(a) Notwithstanding the provisions of § 120.434(e), 7(a) loans may be pledged for the following purposes without notice to or consent by SBA:

(1) Treasury tax and loan accounts;

(2) The deposit of public funds;

(3) Uninvested trust funds;

(4) Borrowings from a Federal Reserve Bank; or

(5) Advances by a Federal Home Loan Bank.

(b) For purposes of the Paycheck Protection Program (PPP), the other provisions of § 120.434 shall also not apply to PPP loans pledged under paragraph (a)(4) or (5) of this section.

**Jovita Carranza,**
*Administrator.*

[FR Doc. 2020–08257 Filed 4–17–20; 8:45 am]

**BILLING CODE P**

## DEPARTMENT OF TRANSPORTATION

**Federal Aviation Administration**

**14 CFR Part 39**

**[Docket No. FAA–2019–1074; Product Identifier 2019–NM–191–AD; Amendment 39–19900; AD 2020–07–21]**

**RIN 2120–AA64**

**Airworthiness Directives; Yaborã Indústria Aeronáutica S.A. (Type Certificate Previously Held by Embraer S.A.) Airplanes**

**AGENCY:** Federal Aviation Administration (FAA), Department of Transportation (DOT).

**ACTION:** Final rule.

**SUMMARY:** The FAA is adopting a new airworthiness directive (AD) for certain Yaborã Indústria Aeronáutica S.A. Model ERJ–170 airplanes and Model ERJ 190–100 STD, –100 LR, –100 ECJ, –100 IGW, –200 STD, –200 LR, and –200 IGW airplanes. This AD was prompted by a determination that certain main landing gear (MLG) aft pintle pins repaired using a sulphamate nickel plating have a life limit that is less than the certified life limit. This AD requires a one-time records review or a general visual inspection (GVI) of the MLG aft pintle pins to determine if certain repairs were done, and replacement of certain MLG aft pintle pins with serviceable MLG aft pintle pins, as specified in an Agência Nacional de Aviação Civil (ANAC) Brazilian AD, which is incorporated by reference. The FAA is issuing this AD to address the unsafe condition on these products.

**DATES:** This AD is effective May 26, 2020.

The Director of the Federal Register approved the incorporation by reference of a certain publication listed in this AD as of May 26, 2020.

**ADDRESSES:** For the material incorporated by reference (IBR) in this AD contact National Civil Aviation Agency, Aeronautical Products Certification Branch (GGCP), Rua Laurent Martins, n° 209, Jardim Esplanada, CEP 12242–431—São José dos Campos—SP, Brazil; telephone 55 (12) 3203–6600; email *pac@anac.gov.br*; internet *www.anac.gov.br/en/*. You may find this IBR material on the ANAC website at *https://sistemas.anac.gov.br/certificacao/DA/DAE.asp*. You may view this IBR material at the FAA, Transport Standards Branch, 2200 South 216th St., Des Moines, WA. For information on the availability of this material at the FAA, call 206–231–3195. It is also available in the AD docket on

the internet at *https://www.regulations.gov* by searching for and locating Docket No. FAA–2019–1074.

## Examining the AD Docket

You may examine the AD docket on the internet at *https://www.regulations.gov* by searching for and locating Docket No. FAA–2019–1074; or in person at Docket Operations between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays. The AD docket contains this final rule, the regulatory evaluation, any comments received, and other information. The address for Docket Operations is U.S. Department of Transportation, Docket Operations, M–30, West Building Ground Floor, Room W12–140, 1200 New Jersey Avenue SE, Washington, DC 20590.

**FOR FURTHER INFORMATION CONTACT:** Krista Greer, Aerospace Engineer, International Section, Transport Standards Branch, FAA, 2200 South 216th St., Des Moines, WA 98198; telephone and fax 206–231–3221; email *krista.greer@faa.gov*.

**SUPPLEMENTARY INFORMATION:**

## Discussion

The ANAC, which is the aviation authority for Brazil, has issued Brazilian AD 2019–11–07, effective November 18, 2019 ("Brazilian AD 2019–11–07") (also referred to as the Mandatory Continuing Airworthiness Information, or "the MCAI"), to correct an unsafe condition for certain Yaborã Indústria Aeronáutica S.A. Model ERJ 170–100 LR, –100 STD, –100 SE, and –100 SU airplanes; Model ERJ 170–200 LR, –200 SU, –200 STD, and –200 LL airplanes; and Model ERJ 190–100 STD, –100 LR, –100 ECJ, –100 IGW, –200 STD, –200 LR, and –200 IGW airplanes. Model ERJ 190–100 SR airplanes are not certified by the FAA and are not included on the U.S. type certificate data sheet; this AD, therefore, does not include those airplanes in the applicability.

The FAA issued a notice of proposed rulemaking (NPRM) to amend 14 CFR part 39 by adding an AD that would apply to certain Yaborã Indústria Aeronáutica S.A. Model ERJ 170–100 LR, –100 STD, –100 SE, and –100 SU airplanes; Model ERJ 170–200 LR, –200 SU, –200 STD, and –200 LL airplanes; and Model ERJ 190–100 STD, –100 LR, –100 ECJ, –100 IGW, –200 STD, –200 LR, and –200 IGW airplanes. The NPRM published in the **Federal Register** on January 17, 2020 (85 FR 2909). The NPRM was prompted by a determination that certain MLG aft pintle pins repaired using a sulphamate