## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MAINE

| | |
|---|---|
| In re:<br><br>Penobscot Valley Hospital,<br><br>Debtor | Chapter 11<br>Case No. 19-10034 |
| Penobscot Valley Hospital,<br><br>Plaintiff<br>v.<br><br>Jovita Carranza, in her capacity as Administrator for the United States Small Business Administration,<br><br>Defendant | Adv. Proc. No. 20-1005 |
| In re:<br><br>Calais Regional Hospital,<br><br>Debtor | Chapter 11<br>Case No. 19-10486 |
| Calais Regional Hospital,<br><br>Plaintiff<br>v.<br><br>Jovita Carranza, in her capacity as Administrator for the United States Small Business Administration,<br><br>Defendant | Adv. Proc. No. 20-1006 |

## PROPOSED FINDINGS AND CONCLUSIONS

Boiled to its essence, the plaintiffs' complaint is that they have been unfairly and illegally denied their spot in the "corporate breadline." These plaintiffs are not alone; many other chapter 11 debtors have the same view. This view is understandable and the plaintiffs here are

particularly sympathetic.  But the Court's task is not to sympathize; it is to interpret the law.

Although there is room for disagreement on the law, the better view is that the defendant—armed

with a mandate from Congress and facing an economic crisis of unprecedented magnitude—

made reasonable choices about how to allocate a large but finite amount of aid among struggling

businesses.  Those choices may produce seemingly harsh results, but they are not illegal.

## I.    Procedural History.

Penobscot Valley Hospital ("PVH") and Calais Regional Hospital ("CRH") are both

debtors in possession in chapter 11 cases.  PVH and CRH are not affiliated, and their chapter 11

cases are separate.  About five weeks ago, PVH and CRH each started adversary proceedings

against Jovita Carranza, in her capacity as Administrator for the United States Small Business

Administration (the "Administrator" or the "SBA").  Those adversary proceedings, which have

since been consolidated under Fed. R. Civ. P. 42, feature the same legal theories and nearly

identical pleadings.  For this reason, the Court will often refer to both entities collectively as "the

Debtor" and employ the singular tense, differentiating between the two plaintiffs only where

warranted by distinctions in the factual landscape.

By its complaint, the Debtor seeks preliminary and permanent injunctive relief, damages,

declaratory relief, and a writ of mandamus.  Shortly after the filing of the complaint, the Debtor

sought a temporary restraining order ("TRO") that would enjoin the SBA and those acting in

concert with it from: (a) denying the Debtor's application under the Paycheck Protection

Program, 15 U.S.C. § 636(a)(36) (the "PPP") or refusing to guaranty a PPP loan sought by the

Debtor solely due to the Debtor's present involvement in bankruptcy; and (b) authorizing,

guarantying, or disbursing funds appropriated for loans under the PPP without reserving

sufficient funds or guaranty authority to provide the Debtor access to PPP funds if the Debtor is

eligible notwithstanding its present involvement in bankruptcy.  Following an expedited hearing

on April 30, 2020, the Court granted the TRO over the SBA's objection.  With the SBA's

consent, a trial on the merits of the complaint was then scheduled for May 27 and the TRO was

extended to May 28.  The TRO was again extended with SBA's consent, this time to 5:30 p.m.

on June 3, 2020.

## II.    **Proposed Findings.**

As discussed in more detail below, the Court is issuing proposed findings in these

proceedings.  These proposed findings are based on the evidence admitted at trial on May 27,

including the parties' stipulations.

On or about March 27, 2020, Congress enacted, and the President signed, the

Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act").  The CARES Act

included stimulus funds designed to assist businesses and ensure that American workers continue

to be paid despite the economic impact of Covid-19 and social distancing measures.  Section

1102 of the CARES Act established the PPP under section 7(a) of the Small Business Act.  A

PPP loan may be forgiven—in whole or in part—under the circumstances set forth in section

1106 of the CARES Act.

A party may apply for a PPP loan by submitting an application to a federally insured,

participating section 7(a) lender or any other lender approved by the SBA.  The SBA has no

authority to make direct loans under the PPP; instead, the SBA may guarantee PPP loans.  Before

providing a PPP loan number to a lender, the SBA does not analyze the PPP application to

determine whether the applicant is likely to liquidate or whether a loan to the applicant would be

of sound value.  Under the CARES Act, eligibility determinations with respect to PPP applicants

rest with lenders, not the SBA.[1]  However, the SBA has established minimal underwriting

requirements for lenders that make PPP loans, including review of the Paycheck Protection

Application Form, SBA Form 2483.

SBA Form 2483 provides, in relevant part, that if the applicant answers "Yes" to question

1, the loan will not be approved.  Question 1 asks whether the applicant is "presently involved in

any bankruptcy[.]"  This question effectively excludes applicants who are "presently involved in

any bankruptcy" from participating in the PPP.  Eligible businesses, including hospitals that are

not in bankruptcy, have obtained PPP funds.

PVH and CRH submitted their initial PPP applications on April 3, 2020.  To question 1,

PVH and CRH each answered "Yes."  First National Bank did not accept CRH's application

because CRH had answered "Yes" to question 1.  As to PVH, Machias Savings Bank ("MSB"),

sought guidance from the SBA about whether it should process the application in light of PVH's

answer to question 1.  The SBA indicated that the application should not be processed because

the affirmative response to question 1 rendered PVH ineligible.  After receiving this guidance,

MSB did not process PVH's application.

PPP funds are processed generally on a first come, first served basis.  Neither PVH nor

CRH received PPP funds prior to their exhaustion under the first tranche of PPP funding.  On or

about April 23, 2020, Congress enacted legislation making additional funds available for PPP.

PVH has submitted a revised PPP application to MSB, consistent with the terms of the

TRO, seeking a loan of approximately $1.5 million.  On May 4, MSB submitted that revised

application on PVH's behalf, and the loan was approved and funded (although the funds have not

---

[1]   The parties have stipulated to certain "facts" that more closely resemble statements of law.  Some of
these stipulations have worked their way into this recitation of proposed findings.  To the extent that the
parties have stipulated to conclusions of law, those stipulations are not binding on the Court.

been disbursed to PVH).  CRH has also prepared a revised PPP application consistent with the

terms of the TRO seeking a loan for approximately $1.7 million but it has been unable to identify

a lender that will process the application.  June 30, 2020 is the current deadline for submissions

of PPP applications.

PVH operates a 25-bed general medical and surgical hospital located in Lincoln, Maine,

with approximately 174 employees.  CRH also operates a 25-bed general medical and surgical

hospital, located in Calais, Maine, with approximately 203 employees.  The objective of both

PVH and CRH, in their respective chapter 11 cases, is to preserve hospital operations and

continuity of patient care in their service areas.  To this end, both PVH and CRH have been

actively engaged in efforts to reorganize and preserve their businesses since their chapter 11

petitions were filed; these are not liquidation cases.

PVH's and CRH's business operations and exit from chapter 11 have been negatively

affected by economic consequences stemming from Covid-19.  A significant portion of the cash

receipts and revenue derived by PVH and CRH flow from outpatient procedures and office visits

or medical procedures.  In the wake of Covid-19, many procedures and office visits have been

postponed, rescheduled, or canceled.  These cancellations and deferrals have had—and are

expected to continue to have—a negative impact on PVH's and CRH's cash receipts and

revenue.  PVH's net patient revenue is about $1.2 million less than budgeted for the period from

March through mid-May of 2020.  At CRH, net patient revenue is nearly $1.8 million less than

budgeted for that same period.  These revenue shortfalls will likely continue to increase into the

future until business operations and patient volume normalize.

Although patient volume at PVH and CRH may vary for many reasons—including stay-

at-home orders—PVH's and CRH's costs are generally fixed.  In addition, PVH and CRH

regularly receive payments from certain payors that are made prospectively each week in fixed amounts.  When patient volume is low, overpayments from these payors are more likely.  As such, both PVH and CRH are likely accruing overpayment liabilities to Medicaid and Anthem, and perhaps Medicare, in amounts that are not yet known.

Since the initiation of these proceedings, PVH has received approximately $3.5 million, and CRH has received more than $3.7 million, in federal stimulus funds for rural hospitals.  Use of these funds is restricted; they are to be used only to prevent, prepare for, and respond to coronavirus, or for health care expenses or lost revenue attributable to coronavirus.  Although these stimulus funds have staved off the immediate risk of closure, they do not guarantee or ensure a successful future outcome for either PVH or CRH, and both hospitals will need the funds to prepare for and respond to future impacts of Covid-19.  The futures of PVH and CRH are still highly uncertain and closure is still possible—although the risk is less immediate than when these proceedings were initiated—because the hospitals do not know when business operations will normalize, what their revenue will be like at that time, or whether they will have unrestricted funds that they can use to pay mounting liabilities.

Due to declining cash receipts in the aftermath of Covid-19, PVH was forced to use funds in its operating account that had been informally budgeted to satisfy overpayment liabilities from 2019 and contract cure payments.  PVH will need to resolve this issue in order to successfully reorganize and avoid liquidation.  CRH has experienced a period of extreme financial hardship due to Covid-19, while likely accruing overpayment liabilities that will need to be resolved in order to successfully reorganize and avoid liquidation.  If PVH and CRH were able to obtain PPP funds, those funds would provide needed liquidity and would facilitate their efforts to reorganize.  PPP funds would not be the sole determinant of a successful exit from chapter 11, but the funds

would enhance those prospects.  Due to the forgivable nature of PPP loans, participation in the

PPP would assist PVH and CRH sustain their respective business operations and exit from

chapter 11.

### III.    Jurisdiction & Judicial Power.

Although the complaint lists four separate counts, there are only two substantive claims

here:  a claim under 11 U.S.C. § 525 ("section 525") and a claim under the Administrative

Procedure Act (the "APA").  Beyond these two claims, the complaint identifies and requests

various types of remedies.  The substantive claims either arise under the Bankruptcy Code or are

related to a case under the Bankruptcy Code.  Gupta v. Quincy Med. Ctr., 858 F.3d 657, 663 (1st

Cir. 2017) (observing that "related to" jurisdiction is "quite broad"); *see also* Pacor, Inc. v.

Higgins, 743 F.2d 984, 994 (3d Cir. 1984) ("The usual articulation of the test for determining

whether a civil proceeding is related to bankruptcy is whether *the outcome of that proceeding*

*could conceivably have any effect on the estate being administered in bankruptcy*.").  As such,

the District Court has subject matter jurisdiction over the parties' disputes under 28 U.S.C. §

1334(b).

On the question of personal jurisdiction over the SBA generally, sovereign immunity

presents little difficulty.  The federal government and its agencies are immune from suit in the

absence of a waiver.  Dep't of the Army v. Blue Fox, Inc., 525 U.S. 255, 260 (1999).  However,

Congress has expressly waived and abrogated sovereign immunity "as to a governmental unit . . .

with respect to" section 525, 11 U.S.C. § 106(a)(1), permitting the court to "hear and determine

any issue arising with respect to the application" of section 525 to a governmental unit, id. §

106(a)(2).  In light of section 106, and because the SBA qualifies as a governmental unit under

11 U.S.C. § 101(27), sovereign immunity does not preclude the exercise of jurisdiction over the

SBA as to the Debtor's claim under section 525.  The District Court also has personal

jurisdiction over the SBA as to the Debtor's claim under the APA.  *See* 5 U.S.C. § 702

(providing that, in general, a person wronged, aggrieved, or adversely affected by agency action

may obtain judicial review in federal court and secure a judgment against the United States).[2]

    These proceedings also raise a question about the exercise of judicial power, a question

that goes beyond subject matter and personal jurisdiction.  As authorized by 28 U.S.C. § 157(a),

the District Court has referred these proceedings to this Court.  *See* D. Me. LR 83.6(a).  But the

existence of a reference from the District Court does not end the analysis.  By statute, this Court

may hear and determine "core proceedings arising under title 11" and may enter "appropriate

orders and judgments, subject to review under [28 U.S.C. § 158]."  28 U.S.C. § 157(b)(1).  This

Court may also "hear a proceeding that is not a core proceeding but that is otherwise related to a

case under title 11."  Id. § 157(c)(1).  In such a proceeding (namely, a proceeding related to a

case under Title 11), the Court "shall submit proposed findings of fact and conclusions of law to

the district court," unless the District Court has referred the matter to this Court with the consent

of all parties.  Id. § 157(c)(1)-(2).

---

[2]    The sovereign immunity questions are a bit thornier when it comes to the remedies that might be
available to a plaintiff wronged by the conduct of the United States or its agencies.  For example, the SBA
contends that 15 U.S.C. § 634(b) renders the Court powerless to enjoin it from conduct that violates
section 525.  Although there is no need to reach this question or any of the other difficult questions
relating to remedies, the Court does not believe that section 634(b) functions as the SBA contends.  *See*
Ulstein Mar., Ltd. v. United States, 833 F.2d 1052, 1057 (1st Cir. 1987) ("The no-injunction language [of
section 634(b)] protects the agency from interference with its internal workings by judicial orders
attaching agency funds, etc., but does not provide blanket immunity from every type of injunction.").  The
Court is similarly unpersuaded by the SBA's contention that money damages are not available for a
violation of section 525.  There is little reason to believe that Congress intended to create such a toothless
tiger.  Why should any governmental unit be licensed to engage in illegal bankruptcy discrimination, with
the only remedies being declaratory or injunctive relief?  That crabbed view has two apparent flaws: it
ignores the text of 11 U.S.C. § 105(a) and it would stymie the fresh start policy of bankruptcy.  Moreover,
courts have not construed other sections of the Bankruptcy Code in a similarly effete manner.  *See, e.g.,*
Bessette v. Avco Fin. Servs., Inc., 230 F.3d 439, 445 (1st Cir. 2000) ("[I]t is clear . . . that a bankruptcy
court is authorized to invoke § 105 to enforce the discharge injunction imposed by § 524 and order
damages . . . if the merits so require.").

A proceeding to determine whether a governmental unit has violated section 525 arises under the Bankruptcy Code and fits within the statutory definition of "core proceedings." *See* 28 U.S.C. § 157(b)(2). However, the Constitution imposes limits on the exercise of judicial power and those limits cannot be altered by statute. *See generally* Stern v. Marshall, 564 U.S. 462 (2011) (concluding that bankruptcy court had statutory authority to enter judgment on a common law tort claim but lacked constitutional authority to do so). As a general matter, whether the Constitution presents an impediment to this Court's exercise of judicial power with respect to certain proceedings is an exceedingly complex question with no clear answer. With respect to the Debtor's section 525 claim, the Court need not grapple with the question for one simple reason: the SBA has knowingly and voluntarily consented to the entry of judgment on the Debtor's claim under section 525. *See* Wellness Int'l Network, Ltd. v. Sharif, 575 U.S. 665 (2015) (holding that Article III is not violated when the parties knowingly and voluntarily consent to the bankruptcy court's adjudication of claims for which the parties are constitutionally entitled to an Article III adjudication).

That said, the Debtor's complaint ventures far beyond the confines of the Bankruptcy Code, asserting a claim under the APA. In that sense, this proceeding is not one arising in or arising under the Bankruptcy Code, but rather is one related to a case under the Bankruptcy Code. It is not a core proceeding and the SBA has not provided consent beyond that relating to section 525. As a result, the Court is constrained to issue proposed findings of fact and conclusions of law. *See* 28 U.S.C. § 157(c).[3]

---

[3] Although one of the Debtor's claims is core and the SBA has consented to entry of judgments and orders on that claim, the Court is nevertheless making proposed findings and conclusions with respect to the complaint in its entirety. Any attempt to issue proposed findings and conclusions on one aspect of the complaint, along with a final judgment subject to appeal under 28 U.S.C. § 158 on other aspects, would create unnecessary procedural complexity.

IV.    **Proposed Conclusions.**

a.    **<u>Administrative Procedure Act.</u>**

The Debtor seeks a declaratory judgment that: (i) the CARES Act does not prohibit, and in fact requires, the SBA to consider its PPP application on the same terms as other entities that are not presently debtors in bankruptcy; and (ii) the Administrator exceeded her statutory authority in promulgating a rule and an application form that exclude those who are presently debtors in bankruptcy from the pool of applicants eligible for PPP loans.  Although the pleading does not invoke any particular statute, the request for a determination that the Administrator exceeded her authority falls within the umbrella of the APA, which provides for judicial review of whether an agency's action is contrary to law in either procedure or substance.  *See* <u>Union of Concerned Scientists v. Wheeler</u>, 954 F.3d 11, 19 (1st Cir. 2020) (citing 5 U.S.C. § 706(2)).

Specifically, the APA provides that a reviewing court shall interpret statutory provisions and "set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law [or] . . . in excess of statutory . . . authority[.]"  5 U.S.C. § 706(2)(A) & (C).  In <u>Chevron v. Natural Resources Defense Council</u>, 467 U.S. 837 (1984), the Supreme Court articulated the following two-part framework for a court called upon to review an agency's interpretation of a statute:

> First, always, is the question whether Congress has directly spoken to the precise question at issue.  If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.  If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation.  Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

> The power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to

fill any gap left, implicitly or explicitly, by Congress.  If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation.  Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.  Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit.  In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.

Id. at 842-44 (footnotes omitted) (quotation marks omitted).  When a court detects a clear and unambiguous answer from Congress, the court should not proceed to the second part of the analytical framework.  See Pereira v. Sessions, 138 S. Ct. 2105, 2113 (2018).

However, if Congress' intentions are unclear, the Court proceeds to the second step of the analysis, characterized by some amount of deference to the agency's interpretations.  See Chevron, 467 U.S. at 844.  "The fair measure of deference to an agency administering its own statute has been understood to vary with circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position[.]"  United States v. Mead Corp., 533 U.S. 218, 228 (2001) (footnotes omitted).  "The approach has produced a spectrum of judicial responses, from great respect at one end, to near indifference at the other[.]"  Id. (citations omitted).  In the second step of the analysis, if an administrative interpretation "represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, [the court] should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned."  Chevron, 467 U.S. at 845 (quotation marks omitted).

With this framework in place, the questions raised by the Debtor's APA claim come into sharper relief.  First, did Congress directly address whether debtors in bankruptcy are eligible to participate in the PPP?  Stated differently, did Congress explicitly or implicitly leave a gap for

11

the SBA to fill in determining whether debtors in bankruptcy are eligible?  If there is a gap in the

statute, does the SBA's exclusion of debtors in bankruptcy from the PPP reflect a "reasonable

accommodation of conflicting policies" committed to the SBA's care?  If yes, is this an

accommodation that Congress would have sanctioned?  To answer these questions, consideration

of the text of the CARES Act and the powers and duties expressly conferred on the

Administrator with respect to the PPP is necessary.

### i.   The CARES Act.

The CARES Act was enacted in late March 2020 in response to a global pandemic that

had, at that time, begun tightening its grip on almost every aspect of American life.  The CARES

Act contains six titles, but the parties' dispute finds its footing in Title I, the Keeping American

Workers Paid and Employed Act.  One way that Congress sought to keep American workers paid

and employed is the PPP, a program designed to help small businesses meet the challenges

caused by the various responses, both governmental and individual, to the pandemic.[4]  The PPP

is, in a manner of speaking, a lifeline for small business in this country.

At its core, the PPP provides that:

> Except as otherwise provided in this paragraph, the Administrator may guarantee
> covered loans under the same terms, conditions, and processes as a loan made
> under this subsection.

15 U.S.C. § 636(a)(36)(B).  The term "covered loan" is a critical term that permeates the statute.

An "eligible recipient" is "an individual or entity that is eligible to receive a covered loan[.]"  Id.

§ 636(a)(36)(A)(iv).  In a section titled "Increased eligibility for certain small businesses and

organizations," the PPP expands the universe of eligible recipients beyond "small business

---

[4]   The PPP has been codified at 15 U.S.C. § 636(a)(36).  Other parts of the CARES Act have also been
codified. *See, e.g.,* 15 U.S.C. § 9005.  In these proposed conclusions, the Court cites the codification of
the CARES Act rather than the public law.

concerns" in at least two respects.  Id. § 636(a)(36)(D)(i)-(ii).  In pertinent part, subparagraph (D) explains that "[d]uring the covered period. . . any business concern . . . shall be eligible to receive a covered loan" if it employs no more than the greater of 500 employees or, "if applicable, the size standard in number of employees established by the Administration for the industry" in which the business operates.  Id. § 636(a)(36)(D)(i).

Subparagraph (F), entitled "Allowable uses of covered loans[,]" begins by identifying, in general, the allowable uses of the proceeds of a covered loan.  Id. § 636(a)(36)(F)(i).  It continues with an express delegation of authority from the SBA to lenders:  "For purposes of making covered loans . . ., a lender approved to make loans under [section 636(a)] shall be deemed to have been delegated authority by the Administrator to make and approve covered loans, subject to [section 636(a)(36)]."  Id. § 636(a)(36)(F)(ii)(I).  When evaluating the eligibility of a borrower for a covered loan, lenders must consider whether the borrower was in operation on February 15, 2020 and had employees for whom the borrower paid salaries or paid independent contractors.  Id. § 636(a)(36)(F)(ii)(II).  This consideration is logically tied to the eligibility criteria in section 636(a)(36)(D)(i).

By enacting the CARES Act, Congress granted the Department of the Treasury authority to include in the PPP lenders that do not already participate in other SBA lending programs.  15 U.S.C. § 9008(b).  The CARES Act further provides that the Secretary of the Treasury "may issue regulations and guidance as necessary . . . to": "(A) allow additional lenders to originate loans under this section; and (B) establish terms and conditions for loans under this section, including terms and conditions concerning compensation, underwriting standards, interest rates, and maturity."  15 U.S.C. § 9008(d)(1).  Such terms and conditions are, "to the maximum extent practicable," to be "consistent with the terms and conditions required" by, among other things,

15 U.S.C. § 636(a)(36)(D), the eligibility provision discussed above.  With guidance from the

Secretary, the Administrator is tasked with administering the program established by 15 U.S.C. §

9008, a statute that refers specifically to the PPP.  Id. § 9008(h).  The Administrator is also given

authority to issue regulations to carry out Title I of the CARES Act without regard to the notice

requirements that might otherwise apply.  15 U.S.C. § 9012.

The CARES Act nestled the PPP into 15 U.S.C. § 636(a), which contains the terms

generally applicable to lending under section 7(a) of the Small Business Act.  Certain provisions

of section 636(a) were expressly modified as to PPP loans, including the SBA's "participation"

(i.e., the extent of the SBA's guarantee).  *Compare* 15 U.S.C. § 636(a)(2)(A) (providing for SBA

participation of 75 percent on a loan in excess of $150,000 and 85 percent on a loan less than or

equal to $150,000), *with* id. § 636(a)(2)(F) (providing for SBA participation in PPP loans of 100

percent).  Other parts of section 636(a) were left unaltered as to PPP loans; subparagraph (B) of

the PPP provides that except as otherwise provided in paragraph (36), "the Administrator may

guarantee covered loans under the same terms, conditions, and processes as a loan made under

this subsection."  Id. § 636(a)(36)(B).  Paragraph (36) did not "provide otherwise" or expressly

modify section 636(a)(6), which requires (subject to certain qualifications not relevant here), that

all loans made under subsection (a) "shall be of such sound value or so secured as to reasonably

assure repayment[.]"  Id. § 636(a)(6).

### ii.    The SBA's PPP Eligibility Rules.

As described above, the CARES Act itself established certain eligibility parameters for

participation in the PPP.  15 U.S.C. § 636(a)(36)(D).  The Administrator, through regulations,

added to those parameters, explaining that an applicant would be ineligible if:

> i. You are engaged in any activity that is illegal under Federal, state, or local law;
> ii. You are a household employer . . .;

14

iii. An owner of 20 percent or more of the equity of the applicant is incarcerated, on probation, on parole; presently subject to an indictment, criminal information, arraignment, or other means by which formal criminal charges are brought in any jurisdiction; or has been convicted of a felony within the last five years; or
iv. You, or any business owned or controlled by you or any of your owners, has ever obtained a direct or guaranteed loan from SBA or any other Federal agency that is currently delinquent or has defaulted within the last seven years and caused a loss to the government.

*See* Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20811 § III(2)(b) (April 15, 2020) (to be codified at 13 C.F.R. pt. 120).  The Administrator also altered, as to PPP applicants, some of its preexisting eligibility rules for participation in SBA loan programs which are codified at 13 C.F.R. 120.110.  For example, the SBA waived a rule that would otherwise prohibit a business owned by a director or shareholder of a PPP lender from applying for a PPP loan through that lender based on a recognition that, "unlike other SBA loan programs, the financial terms for PPP Loans are uniform for all borrowers, and the standard underwriting process does not apply because no creditworthiness assessment is required for PPP Loans."  Business Loan Program Temporary Changes; Paycheck Protection Program— Additional Eligibility Criteria and Requirements for Certain Pledges of Loans, 85 Fed. Reg. 21747 § III(2)(a) (April 20, 2020) (to be codified at 13 C.F.R. pt. 120).  Instead of the standard underwriting process, the SBA implemented a "streamlin[ed]" process to "provide relief to America's small businesses expeditiously."  *See* 85 Fed. Reg. 20811 § III(1)

The rule specifically challenged by the Debtor here provides as follows:

4. Eligibility of Businesses Presently Involved in Bankruptcy Proceedings

*Will I be approved for a PPP loan if my business is in bankruptcy?*

No.  If the applicant or the owner of the applicant is the debtor in a bankruptcy proceeding, either at the time it submits the application or at any time before the loan is disbursed, the applicant is ineligible to receive a PPP loan.  If the applicant or the owner of the applicant becomes the debtor in a bankruptcy proceeding after submitting a PPP application but before the loan is disbursed, it is the applicant's

obligation to notify the lender and request cancellation of the application.  Failure
by the applicant to do so will be regarded as a use of PPP funds for unauthorized
purposes.

The Administrator, in consultation with the Secretary, determined that
providing PPP loans to debtors in bankruptcy would present an unacceptably high
risk of an unauthorized use of funds or nonrepayment of unforgiven loans.  In
addition, the Bankruptcy Code does not require any person to make a loan or a
financial accommodation to a debtor in bankruptcy.  The Borrower Application
Form for PPP loans (SBA Form 2483), which reflects this restriction in the form
of a borrower certification, is a loan program requirement.  Lenders may rely on
an applicant's representation concerning the applicant's or an owner of the
applicant's involvement in a bankruptcy proceeding.

Business Loan Program Temporary Changes; Paycheck Protection Program—Requirements—

Promissory Notes, Authorizations, Affiliation, and Eligibility, 85 Fed. Reg. 23450 § III(4) (April

28, 2020) (to be codified at 13 C.F.R. pts. 120-121).

### iii.    Legality of the Bankruptcy Exclusion Under the APA.

The Debtor contends that Congress, by statutory fiat, eliminated the SBA's discretion in

administering the PPP.  Specifically, the Debtor posits that the eligibility provisions of 15 U.S.C.

§ 636(a)(36)(D) override any discretion inherent in the word "may" as featured in 15 U.S.C. §

636(a)(36)(B), and preclude any action by the Administrator that shrinks the pool of eligible

applicants specified in the statute.  There is support for the Debtor's perspective.  *See, e.g.,* DV

Diamond Club of Flint, LLC v. U.S. Small Bus. Admin., --- F. Supp. 3d ---, 2020 WL 2315880,

at *10 (E.D. Mich. May 11, 2020) (discussing section 636(a)(36)(D) and concluding that "the

text of the PPP makes clear that every business concern meeting the statutory criteria is eligible

for a PPP loan during the covered period").  Although this interpretive theory has some appeal, it

puts too much emphasis on certain words in isolation ("shall" and "may") while ignoring the

critical concept of "eligibility."  In common parlance, the word "eligible" carries a connotation

of choice.  *See* Webster's II New University Riverside Dictionary 425 (Anne H. Soukhanov &

Kaethe Ellis eds., 1984).  The Court does not believe that Congress would have infused the PPP

with concept of "eligibility" if the intention was for the SBA to have no ability to choose which individuals and businesses would benefit from loan guarantees. Congress did not explicitly say whether debtors in bankruptcy are categorically excluded from the PPP. Congress did exclude debtors from another form of economic aid described in the CARES Act. *See* 15 U.S.C. § 9042(c)(3)(D)(i)(V). This exclusion does not tip the scales one way or the other when it comes to the PPP. *See* United States v. Granderson, 511 U.S. 39, 63 (1994) (Kennedy, J., concurring) (explaining that presumption that Congress acts intentionally when it includes particular language in one part of a statute but omits it in another "loses some of its force when the sections in question are dissimilar and scattered at distant points of a lengthy and complex enactment"). It does, however, suggest that Congress intended the SBA to fill a statutory gap and determine whether debtors in bankruptcy would be eligible for the PPP. As a result, in evaluating the APA claim, the Court proceeds to the second step of the Chevron framework.

The SBA defends the bankruptcy exclusion as a proper exercise of its rulemaking function. In the SBA's view, Congress defined the universe of "eligible recipients" but left the SBA free to choose among those recipients when utilizing the guaranty authority appropriated for the PPP. That act of choosing, says the SBA, is a prototypical exercise of discretion that should not be set aside by the Court based on its own policy judgments. The Court agrees.

The SBA's bankruptcy exclusion was a reasonable effort to accommodate the conflicting policies committed to the SBA's care, and one that Congress might reasonably have sanctioned. Many approaches could have been taken when determining whether and under what circumstances a debtor in bankruptcy might be approved for a PPP loan. The SBA could have determined that any debtor could participate in the PPP if authorized by the bankruptcy court. The SBA could have excluded chapter 7 debtors, but not debtors in other chapters; or some

chapter 11 debtors, but not others.  None of these approaches alter the reality that the SBA had

very little time to implement this program and that standard underwriting would have been

impractical.  Under the circumstances, in light of Congress' intent to see the PPP funds

distributed quickly, the SBA relaxed its underwriting standards.  The SBA did not, however,

eliminate all underwriting; viewed together, the questions on SBA Form 2483 represent at least a

minimal effort to learn something about whether a covered loan will be repaid if not forgiven.

Despite the Debtor's assertions and notwithstanding some of the preliminary

determinations made in the TRO, the PPP is a loan program; it is not merely a grant of aid.

Certain features of PPP loans make them highly desirable from a borrower's perspective—most

notably the prospect of debt forgiveness.  And there are many other features that distinguish PPP

loans from section 7(a) loans.[5]  But, a distribution of PPP funds initially assumes the form of a

loan.  Congress knows how to distribute aid without strings attached and, in fact, did so recently.

*See, e.g.,* 26 U.S.C. § 6428(a) (amending the IRC to provide so-called "recovery rebates" as tax

credits for certain individuals in the wake of Covid-19).  With the PPP, however, Congress

elected to establish a loan program, albeit one that does not look like any other loan program

available from the government or the capital markets.  These loans may function as a grant of aid

during a crisis, but they are still—at least at their inception—loans.

Given the nature of the PPP, the reasonableness of the SBA's underwriting efforts,

however truncated—or, to use the SBA's term, "streamlined"—becomes clear.  Until a debt

---

[5]    For example, compare 15 U.S.C. § 636(a)(18), addressing guarantee fees for section 7(a) loans, and
15 U.S.C. § 636(a)(36)(H), waiving the guarantee fees.  There are other differences as well, including
interest rate, loan term, prepayment penalties and deferment of principal payments.  These distinctions in
the financial terms are likely what Congress had in mind when, in 28 U.S.C. § 636(a)(36)(B), it wrote
"Except as otherwise provided in [28 U.S.C. § 636(a)(36)] . . . ."  To this extent, this Court parts ways
with DV Diamond Club of Flint, LLC v. U.S. Small Bus. Admin., --- F. Supp. 3d ---, 2020 WL 2315880,
(E.D. Mich. May 11, 2020).

evidenced by a PPP note is forgiven in accordance with the law, the holder of the note and a guarantor are rightfully concerned about the maker's ability to satisfy the debt.  This is true whether or not the note bears a low, fixed rate of interest, and it is even more true where, as here, there is no collateral for the debt and no personal guarantee supporting the obligation.  *See* 15 U.S.C. § 636(a)(36)(J), (L).  Perhaps a person's status as a debtor presently involved in bankruptcy is a crude measure of creditworthiness, but it is still a measure.[6]

The Debtor may counter all of this by observing that Congress expressly delegated eligibility consideration to lenders*, see* 15 U.S.C. § 636(a)(36)(F)(ii), and that lenders, not the SBA, are imbued with the discretion to make covered loans.  Wrapping it all together, the Debtor might say that Congress expanded the universe of eligible recipients and then instructed lenders, not the SBA, to make decisions about how to choose among those recipients.  The difficulty with that line of attack is that it only looks at the loan, and not the guaranty which, as noted above, is a full guaranty of an unsecured loan without any supporting obligation and with minimal underwriting on the front end.  The PPP was constructed on the strength of the public fisc, and it would be counterintuitive to assume that the lenders—who one can assume are taking very little risk—were given all of the discretion that Congress contemplated when it said that the SBA "may" guarantee a covered loan.

---

[6]    Characterizing the PPP as a loan program is reconcilable with the SBA rule that states that "no creditworthiness assessment is required" when that particular language is taken in context.  *See* 85 Fed. Reg. 21747 § III(2)(a).  The rule permits the director or shareholder of a PPP lender to obtain a PPP loan from that lender for an unrelated business concern in which that director or shareholder is involved, despite a regulation that would prohibit such a transaction as to other section 7(a) loans.  Id.  The rule reflects the reality that the underwriting process is so streamlined that a PPP lender has little ability to play favorites or to relax standards when it comes to an application submitted by a director or shareholder of the lender.  In any event, the "no creditworthiness assessment" language is too slender a reed to support the full weight of the Debtor's argument when the entire program is considered.

    **b.** <u>**Section 525.**</u>

The Debtor, like many others, believes that the SBA's bankruptcy exclusion conflicts with the Bankruptcy Code's prohibition on discrimination.  Invoking due process concepts and anti-discrimination laws for protected classes of persons, the Debtor sees a clear case of "ad hoc, unwarranted" discrimination prohibited by section 11 U.S.C. § 525(a).  Before examining the language of the statute, there is one overriding point that bears initial emphasis:  the federal government may discriminate against bankruptcy debtors, as long as the discrimination does not run afoul of 11 U.S.C. § 525(a) or (c).  Bankruptcy debtors simply do not enjoy the same level of protection from discrimination as constitutionally protected classes of persons.  With that in mind, the Court turns to the place where the analysis must begin, the text of the statute.

    In relevant part, section 525(a) provides:

> [A] governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, deny employment to, terminate the employment of, or discriminate with respect to employment against, a person that is or has been a debtor under this title or a bankrupt or a debtor under the Bankruptcy Act, or another person with whom such bankrupt or debtor has been associated, solely because such bankrupt or debtor is or has been a debtor under this title or a bankrupt or debtor under the Bankruptcy Act, has been insolvent before the commencement of the case under this title, or during the case but before the debtor is granted or denied a discharge, or has not paid a debt that is dischargeable in the case under this title or that was discharged under the Bankruptcy Act.

11 U.S.C. § 525(a).  Because the SBA is a governmental unit, 11 U.S.C. § 101(27), the Debtor is a person, 11 U.S.C. § 101(41), and the Debtor's status as debtor in a case under Title 11 was the proximate cause of its exclusion from the PPP, *see* <u>F.C.C. v. NextWave Personal Communications Inc.</u>, 537 U.S. 293, 301 (2003), the only question is whether this case involves a "license, permit, charter, franchise, or other similar grant" within the meaning of section

525(a).  The question is formulated with relative ease, but finding the answer is more

challenging.

### i.  License, Permit, Charter, or Franchise.

The words "license," "permit," "charter," and "franchise" are not defined in the

Bankruptcy Code, leaving the Court to search elsewhere for their meanings.  While some of

these terms have different meanings in the commercial context, section 525(a) is only concerned

with action by governmental units.  Accordingly, the critical terms must be evaluated in light of

their meanings when used in the governmental context.  A "license" is a "revocable permission

to commit some act that would otherwise be unlawful" or an "agreement . . . that it will be lawful

for the licensee to . . . do some act that would otherwise be illegal, such as hunting game."

Black's Law Dictionary 931 (7th ed. 1999).  A "permit" is a "certificate evidencing permission"

or "a license."  Id. at 1160.  A "charter" is an "instrument by which a governmental entity . . .

grants rights, liberties, or powers to its citizens."  Id. at 228.  And finally, the term "franchise" is

defined as "[t]he right conferred by the government to engage in a specific business or to

exercise corporate powers."  Id. at 668.  Each of the enumerated items is a type of grant from a

governmental actor that involves some permission for the holder of the grant to act in a particular

way.  See Watts v. Pa. Hous. Fin. Co., 876 F.2d 1090, 1093 (3d Cir. 1989); see also Toth v.

Mich. State Hous. Dev. Auth., 136 F.3d 477, 480 (6th Cir. 1998) (quoting Watts).  For example,

a driver's license is a permission to operate a motor vehicle on public roads.  That a "permit"

necessarily involves a permission is axiomatic.  The terms "charter" and "franchise" have less

obvious connections to permissions, but the concept is there nevertheless.

The "permission" view of section 525(a) is sensible:  the government should not be able

to erect barriers to the realization of a debtor's fresh start solely because the debtor has availed

itself of the right to a financial fresh start under federal law.  There would be little sense in any

contrary view.  Withholding permission for a debtor to operate a motor vehicle solely because

the debtor received a discharge would seriously undermine the debtor's ability to earn a living.

*See* Perez v. Campbell, 402 U.S. 637 (1971) (invalidating, under the Supremacy Clause, an

Arizona law allowing the state to withhold a driver's license from a person who received a

discharge solely because that person did not pay a discharged debt).  But withholding a

permission to engage in activity that is essential to the enjoyment of the benefits of a fresh start a

la Perez is different from declining to provide assistance in the form of a loan on favorable terms

(or even a grant of aid) that might be useful to obtaining a fresh start.

The parties do not cite controlling authority applying section 525(a) to a loan.  That is

understandable because, in general, a party cannot be forced to make a loan to a debtor.  *See* 11

U.S.C. § 365(c)(2).  Although section 365(c)(2) is not directly applicable here because there is

no prepetition contract to make a loan, the policy behind section 365(c)(2) supports an

interpretation of section 525(a) that does not extend to loans.  As one court recently put it, the

point may be attenuated, but it is nevertheless a valid consideration.  *See* Transcript of Hearing,

Cosi, Inc. v. U.S. Small Bus. Admin. (In re Cosi, Inc.), Adv. Proc. 20-50591 (Bankr. D. Del.

April 30, 2020), Dkt. No. 17.

Perhaps recognizing that section 525(a) is not sufficiently elastic to be stretched to cover

a loan, the Debtor argues that the PPP does not involve the provision of a loan.[7]  For the reasons

explained above, the Court is unpersuaded:  the PPP creates a loan program.  The existence of

favorable terms and a unique feature (namely, forgiveness under specified circumstances) does

---

[7]    The Debtor has consistently urged the Court to afford the Debtor the right to participate in the PPP.
The request is couched in terms of a "right" and, less explicitly, a "permission" to participate.  Fair
enough, but it is apparent that the Debtor's ultimate goal is the money.

not change the character of what the Debtor wants to obtain: a loan that might be forgiven by the

lender. The Debtor makes much of the SBA's concession that it does consider whether an

applicant is likely to liquidate before providing a loan number for an application. That does not,

in the Court's view, establish that the PPP is a "grant program" instead of a "loan program."

Instead, the SBA has recognized that, in these circumstances, there was insufficient time for

traditional underwriting processes to be utilized. The funds had to be deployed quickly, both

because of the immediate needs of the recipients and their employees and because of the

statutory deadlines.

But even if the Court were to conclude that the PPP establishes a grant program, the

benefits of this particular program would not constitute a license or a franchise.[8] There is no

suggestion that the PPP would authorize the Debtor to undertake a particular act—an essential

feature of a license—and the PPP would not confer a special privilege on the Debtor to engage in

a specific business or exercise corporate power—an essential feature of a franchise.[9]

### ii.  Other Similar Grant.

The phrase "other similar grant" remains as the last arrow in the Debtor's section 525

quiver. This arrow comes closer to the target, but, like the others, sails wide. "Although the

term 'grant' is not defined in the statute, the use of the word 'similar' limits the universe of

'grants' to which § 525(a) applies, ensuring that only grants bearing a family resemblance to

---

[8]  The Debtor does not appear to contend that the PPP qualifies as a permit or a charter.

[9]  Some decisions take a broader view of the meaning of the term "franchise." For example, in
Exquisito Services Inc. v. United States (In re Exquisito Services, Inc.), 823 F.2d 151 (5th Cir. 1987), the
court concluded that the Air Force had violated section 525(a) by declining to exercise an option contract
with a company to provide services solely because that company had filed for bankruptcy. In so doing,
the court reasoned that the contract was "essentially a franchise" because it fell under the umbrella of the
SBA's section 8(a) program, and the SBA would assist the company during the life of the contract. Id. at
154. Because the court did explain how any governmental program that assists people amounts to a
franchise, its decision carries limited persuasive force.

licenses, permits, charters, and franchises enjoy the anti-discrimination protections of the

Bankruptcy Code." Ayes v. U.S. Dep't of Veterans Affairs, 473 F.3d 104, 108 (4th Cir. 2006);

*see also* Goldrich v. N.Y. Higher Educ. Servs. Corp. (In re Goldrich), 771 F.2d 28, 31 (2d Cir.

1985) (noting that "Congress rejected a flat prohibition on any form of discrimination" and

inferring that "Congress chose its words carefully"). The question then becomes: how strongly

must an item not specifically enumerated in the statute resemble the items enumerated in order to

fall within the anti-discrimination ambit?

Other courts have struggled to define the scope of section 525 based on its text. *See*

Stoltz v. Brattleboro Hous. Auth. (In re Stoltz), 315 F.3d 80, 88 (2d Cir. 2002) ("Despite more

than twenty years of judicial consideration, . . . the scope of Section 525(a)'s protection in the

context of public housing is still unsettled."); Saunders v. Reeher (In re Saunders), 105 B.R. 781,

787 (Bankr. E.D. Pa. 1989) (observing that "there has been understandable difficulty in defining

the exact scope of this subsection given its language and legislative history"). Some courts

conclude that the common thread connecting licenses, permits, charters, and franchises is that all

are "governmental authorizations that typically permit an individual to pursue some occupation

or endeavor aimed at economic betterment." Ayes, 473 F.3d at 108. Other courts observe that

these enumerated items are all unrelated to credit, Goldrich, 771 F.2d at 30, and do not give rise

to mutual obligations between the governmental unit and the individual, United States v. Cleasby

(In re Cleasby), 139 B.R. 897, 900 (W.D. Wis. 1992). Still others emphasize that licenses,

permits, charters, franchises, and other similar grants are items "unobtainable from the private

sector and essential to a debtor's fresh start."  In re Soltz, 315 F.3d at 90; *see also* In re Saunders,

105 B.R. at 787.[10]

The varied interpretations of section 525(a), combined with the elasticity inherent in the

word "similar," might lead to the conclusion that section 525(a) is ambiguous.  In that case,

resort to the legislative history, as a means of ascertaining the meaning of the words that

Congress used, would be appropriate.  The House and Senate reports contain the following

explanation:

> [Section 525] is an additional debtor protection.  It codifies the result of
> Perez v. Campbell, 402 U.S. 637 (1971), which held that a state would frustrate
> the congressional policy of a fresh start for a debtor if it were permitted to refuse
> to renew a drivers license because a tort judgment resulting from an automobile
> accident had been unpaid as a result of a discharge in bankruptcy.
>
> Notwithstanding any other laws, section 525 prohibits a governmental unit
> from denying, revoking, suspending, or refusing to renew a license, permit,
> charter, franchise, or other similar grant to, from conditioning such a grant to,
> from discrimination with respect to such a grant against, deny[ing] employment
> to, terminat[ing] the employment of, or discriminat[ing] with respect to
> employment against, a person that is or has been a debtor or that is or has been
> associated with a debtor.  The prohibition extends only to discrimination or other
> action based solely on the basis of the bankruptcy, on the basis of insolvency
> before or during bankruptcy prior to a determination of discharge, or on the basis
> of nonpayment of a debt discharged in the bankruptcy case (the Perez situation).
> It does not prohibit consideration of other factors, such as future financial
> responsibility or ability, and does not prohibit imposition of requirements such as
> net capital rules, if applied nondiscriminatorily.
>
> In addition, the section is not exhaustive.  The enumeration of various
> forms of discrimination against former bankrupts is not intended to permit other
> forms of discrimination.  The courts have been developing the Perez rule.  This
> section permits further development to prohibit actions by governmental or quasi-
> governmental organizations that perform licensing functions, such as a state bar
> association or a medical society, or by other organizations that can seriously

---

[10]   The Saunders court characterized section 525(a) as covering certain "property interests not
obtainable through the private sector."  105 B.R. 781, 787 (Bankr. E.D. Pa. 1989).  This Court is skeptical
of the notion that the items enumerated in section 525(a) amount to "property interests" in all
circumstances.  The Saunders court also concluded that, even if section 525(a) had been violated, no
award of money damages was authorized.  Id. at 788.  In these two respects, Saunders is not convincing.

affect the debtors' livelihood or fresh start, such as exclusion from a union on the basis of discharge of a debt to the union's credit union.

The effect of the section, and of further interpretations of the Perez rule, is to strengthen the anti-reaffirmation policy found in section 524(b). Discrimination based solely on nonpayment could encourage reaffirmations, contrary to the expressed policy.

The section is not so broad as a comparable section proposed by the bankruptcy commission . . . which would have extended the prohibition to any discrimination, even by private parties. Nevertheless, it is not limiting either, as noted. The courts will continue to mark the contours of the anti-discrimination provision in pursuit of sound bankruptcy policy.

H.R. Rep. 95-595, at 366-67 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6322-23; S. Rep. 95-

989, at 81 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5867. The House report also contains

further explanation of the genesis of section 525:

 The bill [that became section 525(a)] codifies [an] important debtor protection, first enunciated by the Supreme Court in 1971 in the case of Perez v. Campbell. In that case, Arizona refused to renew a drivers license because the driver had been in an automobile accident, had been sued as a result, and lost. The driver was uninsured. He filed bankruptcy and the tort judgment was discharged. Arizona had a general policy forbidding a drivers license to any motorist that failed to pay a tort judgment arising out of an automobile accident. The Supreme Court held that if such policy were applied to include nonpayment by reason of a discharge in bankruptcy, the policy would run afoul of the federal bankruptcy policy of ensuring the debtor in a bankruptcy case a fresh start. The court ordered the license issued.

Similar discrimination has occurred in other areas as well. Municipalities have occasionally dismissed employees such as foremen or policemen because of a bankruptcy. Nonpayment of a debt to a credit union has occasionally resulted in loss of a job. Various state and federal laws automatically deny certain licenses to an individual solely on the basis of a bankruptcy.

These practices are seriously detrimental to a debtor's fresh start, and are contrary to bankruptcy policy. The courts have followed the Perez doctrine in some of these instances, and have restored bankruptcy to positions from which they were excluded because of the bankruptcy. The doctrine is a developing doctrine, and its precise ultimate contours are not yet clear. More case law will undoubtedly develop the extent of the discrimination that is contrary to bankruptcy policy.

Nevertheless, the bill [that became section 525(a)] codifies one important aspect of the protection against discriminatory treatment . . . prohibit[ing] action by a governmental agency, that is based solely on the basis of a filing under . . . the Bankruptcy Code.  The prohibition does not extend so far as to prohibit examination of the factors surrounding the bankruptcy, the imposition of financial responsibility rules if they are not imposed only on former bankrupts, or the examination of prospective financial condition or managerial ability.  The purpose of the section is to prevent an automatic reaction against an individual for availing himself of the protection of the bankruptcy laws.  Most bankruptcies are caused by circumstances beyond the debtor's control.  To penalize a debtor by discriminatory treatment as a result is unfair and undoes the beneficial effects of the bankruptcy laws.  However, in those cases where the causes of a bankruptcy are intimately connected with the license, grant, or employment in question, an examination into the circumstances surrounding the bankruptcy will permit governmental units to pursue appropriate regulatory policies and take appropriate action without running afoul of bankruptcy policy.

H.R. Rep. 95-595, at 165 (footnotes omitted).

To the extent that the text of section 525(a) provides some wiggle room, and to the extent that the legislative history encourages courts to continue to develop the <u>Perez</u> rule, the PPP nevertheless fails to qualify as an item protected by the anti-discrimination provision.  The exclusion of persons involved in bankruptcy from the PPP does not conflict with the fresh start or otherwise frustrate the operation of the Bankruptcy Code.  *See generally* <u>Perez</u>, 402 U.S. at 649-51 (analyzing whether a state statute was in conflict with the Bankruptcy Code's fresh start policy or otherwise frustrated the operation of the Code).  The examples of prohibited discrimination that might fall within the expanded ambit of section 525(a) identified in the legislative history relate to restrictions on a debtor's affiliations or activities that would render it very difficult if not impossible for a debtor to pursue his or her chosen livelihood.  In these proceedings, the exclusion of the Debtor from the PPP is not similar to denying a debtor a license to operate in his chosen field and thereby denying the debtor the opportunity to pursue economic betterment.  There is no question that the Debtor is experiencing serious financial hardship in the current circumstances and some of that may be attributable to the Debtor's decision to follow

Document   Page 28 of 31

governmental recommendations designed to protect the public health.  Despite its severity, that financial stress was not caused by the SBA's decision to exclude the Debtor from the PPP.  It may be harder for the Debtor to confirm a plan of reorganization without the PPP funds, but that difficulty itself does not render the Administrator's decision to exclude debtors from the PPP a violation of section 525.  *See* Jasper v. Bowdoinham Fed. Credit Union (In re Jasper), 325 B.R 50, 54 (Bankr. D. Me. 2005) (holding that denial of "check cashing privileges, ATM transactions, online banking, minimum account balances and the like" did not violate section 525(a) even though the debtors would likely pay more for these services in the commercial marketplace).

The PPP is not a grant that is similar to a license, permit, charter, or franchise.  The PPP is not a permission granted by the government to allow persons to engage in economic activity; it is a government-guaranteed program of credit extension on generous terms with forgiveness features intended to aid small businesses and incentivize them to retain employees during an unprecedented economic downturn.  Whether this program is properly characterized as a loan or a grant, it is ultimately a form of "financial assistance [that] does not constitute a 'similar grant' within the scope of § 525."  *See* In re Cleasby, 139 B.R. at 900.

### iii.  The Broader View of Section 525.

Armed with both textual argument and policy-based arguments, the Debtor has advanced its view that SBA's bankruptcy exclusion violates section 525.  Despite the appeal of that theory, the caselaw that adopts a broader view of section 525 is either distinguishable or unpersuasive. For example, Rose v. Connecticut Housing Authority (In re Rose), 23 B.R. 662 (Bankr. D. Conn. 1982) contains a cogent discussion of section 525 and the Congressional purpose animating that section, as well as a survey of cases in this subject.  However, Rose does not offer a persuasive

explanation of how mortgage financing fits within the actual text of the statute adopted by Congress.  Hillcrest Foods, Inc. v. Briggs (In re Hillcrest Foods, Inc.), 10 B.R. 579 (Bankr. D. Me. 1981) is similarly unhelpful to the Debtor.  Hillcrest concluded preliminarily, and without discussion, that a debtor's ability to self-insure for worker's compensation fell within the protection of section 525(a).  Id. at 579-80.  There was, in Hillcrest, a "permission" (namely, permission to self-insure) that is not present with a loan program.

Stinson v. BB & T Investment Services, Inc. (In re Stinson), 285 B.R. 239 (Bankr. W.D. Va. 2002), relied on by the Debtor, is consistent with the interpretive approach employed here. In Stinson, the court held that section 525(b) does not extend to a private employer's refusal to hire a person solely because that person had been a debtor or received a discharge.  Id. at 250. That conclusion was based on the words used in section 525(a)—which extends to a denial of employment by a governmental unit—in comparison to the words used in section 525(b)—which does not expressly extend to a denial of employment by a private employer.  See id. at 247-48. Stinson is a useful illustration of a court sticking to the words of the statute, even though the purpose of the statute might have been promoted by the debtor's preferred interpretation of section 525(b).  See id. at 247.

The Debtor fares better with its citation to In re The Bible Speaks, 69 B.R. 368 (Bankr. D. Mass. 1987), where the court concluded that a school's ability, under a federal statute, to offer unaccredited courses and to have students receive tuition subsidies was analogous to a license or franchise and constituted an "other similar grant."  The problem, however, with The Bible Speaks and other similar cases is that they stretch the key terms in the statute too far.  Congress did not impose a flat prohibition on bankruptcy discrimination by governmental units (although

doing so would have been entirely consistent with sound bankruptcy policy).[11]  The very words

on the page indicate a limitation.  In its supplemental memorandum in support of its motion for a

TRO, the Debtor protests that "the government cannot bar a debtor from applying for a

government program solely because of the person's status as a bankruptcy debtor."  But that is

not what section 525(a) says.  It does not bar discrimination with respect to all "government

programs," but instead uses more limited terms.

A final note about the caselaw cited by the Court in the TRO:  although the Court cited

Stoltz, that decision is not binding.  Further, even if the Court were to find Stoltz persuasive and

follow it here, the PPP would not qualify as an "other similar grant" under the reasoning

employed by the Second Circuit.  In Stoltz, the court concluded that public housing leases are

items protected by section 525(a) because: (a) a lease is a type of grant and (b) public housing

leases are similar to the items enumerated in the statute because they are items conferred only by

the government and are essential to a debtor's fresh start.  315 F.3d at 89-90.  By contrast, a PPP

loan is not a grant and even if it were, the Court cannot conclude on this record that it is essential

to the Debtor's fresh start; it might be helpful but there has been no showing that it is necessary.

In fact, the dissenting opinion in Stoltz contains what this Court believes is the better view of

section 525, both in terms of a textual analysis and in terms of making sense of section 525 in

light of the other parts of the Bankruptcy Code.  *See generally* Stoltz, 315 F.3d at 95-97.

---

[11]    In fact, when the Commission on the Bankruptcy Law of the United States published its
recommendations to Congress in 1973, it proposed the enactment of a law providing that "[a] person shall
not be subjected to discriminatory treatment because he, or any person with whom he is or has been
associated, is or has been a debtor or has failed to pay a debt discharged in a case under the Act."  H. R.
Doc. No. 93-137, pt. 2, at 143-44 (1973).  A reform bill drafted by the National Conference of
Bankruptcy Judges was nearly identical.  In response to a hue and cry about the breadth of the proposals,
Congress altered the language, ultimately settling on the text of section 525(a) that is currently in effect.

## V.   <u>**Conclusion.**</u>

Based on these proposed findings and conclusions, judgment should enter in favor of the

SBA and against the Debtor on all counts of the Debtor's complaint.


Date: June 3, 2020

_____
Michael A. Fagone
United States Bankruptcy Judge
District of Maine